# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 11, 2000 Session

## MICHAEL EUGENE SAMPLE and LARRY MCKAY
## v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-14252, P-14266     Bernie Weinman, Judge**

---

**No. W1999-01202-CCA-R3-PC - Filed January 17, 2001**

---

The Defendants were each convicted in 1982 of two counts of felony murder.  Each Defendant received two death penalties for the murders.  On post-conviction, the Defendants contend that the State withheld exculpatory information and that their death penalties were predicated in part on an invalid aggravating circumstance.  The trial court dismissed the petitions without a hearing, finding that the Brady claims were time-barred and finding beyond a reasonable doubt that the jury would have imposed the death sentences absent consideration of the invalid aggravating circumstance. The Defendants now appeal the trial court's findings on both claims for relief.  We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J. and CORNELIA A. CLARK, SP.J., joined.

David M. Eldridge and Richard L. Gaines, Knoxville, Tennessee; and Harry R. Reinhart, Columbus, Ohio, for the appellant, Michael Eugene Sample.

David C. Stebbins, Columbus, Ohio, for the appellant, Larry McKay.

Paul G. Summers, Attorney General and Reporter; Erik W. Daab, Assistant Attorney General; William L. Gibbons, District Attorney General; and Reginald Henderson and John W. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In 1982, the Defendants Larry McKay and Michael Eugene Sample were jointly tried and convicted of murdering two men during the perpetration of a robbery in 1981.  Both Defendants were sentenced to death for each murder.  Their convictions and sentences were affirmed on direct

appeal. See State v. McKay, 680 S.W.2d 447, 453 (Tenn. 1984). Several post-conviction petitions were subsequently filed, all of which were denied.

In early 1995, the Defendants filed the instant post-conviction petitions, alleging numerous grounds for relief. The trial court dismissed Sample's petition for lack of jurisdiction. It dismissed McKay's petition as barred by the statute of limitations.[1] The Defendants appealed, and this Court remanded for further proceedings. See Michael Eugene Sample v. State, No. 02C01-9505-CR-00131, 1996 WL 551754, at *14 (Tenn. Crim. App., Jackson, Sept. 30, 1996). The trial court again denied relief, and this matter is now before us for the second time.

Before we address the issues on this appeal, a further review of the prior proceedings is helpful. As set forth in our prior opinion, the instant petitions allege four grounds for relief:

> 1.  The State presented false testimony at trial and suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963)[2] ("the Brady claims");
>
> 2.  The death sentences were predicated on an invalid aggravating circumstance under State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992) ("the Middlebrooks error");
>
> 3.  The jury instructions defining reasonable doubt at both phases of the trial were unconstitutional; and
>
> 4.  Numerous other errors by the trial court, prosecutors and trial counsel violated the Tennessee and United States constitutions.

See id. at *1. The trial court dismissed Sample's petition without a hearing because a prior post-conviction appeal was then pending before this Court, and we found that dismissal to be error. See

---

[1]As noted in our previous opinion, the State did not raise the statute of limitations defense in its initial response to the Defendants' petitions. However, this issue may be raised by the trial court sua sponte. See Rickman v. State, 972 S.W.2d 687, 691 (Tenn. Crim. App. 1997).

[2]Under Brady, the prosecution must furnish exculpatory information to the defendant upon request. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

id. at \*2. The trial court also dismissed without a hearing McKay's petition, which had been filed on February 1, 1995, as barred by the applicable three-year statute of limitations.[3] See id. at \*1.

On the initial appeal, we determined that the Defendants' claims regarding the jury instructions defining reasonable doubt were "without merit." Id. at \*11. We further held that the Defendants were not entitled to relief on any of the "numerous other errors" referred to above. Id. at \*12. However, we held that further proceedings were necessary on the Brady claims and the Middlebrooks error. Id. at \*8, 18.

With respect to the Brady claims, we first noted that the Defendants' allegations "clearly stated constitutional grounds for relief." Id. at \*4. Because the trial court had summarily dismissed the petitions, we concluded that the trial court had not given "due consideration" to the "key issues" of "whether [the Brady claims] were viable at this stage of the post-conviction proceedings." Id. In short, we determined that, under Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992), the Brady claims might still be cognizable even though the statute of limitations on the Defendants' post-conviction claims for relief had expired prior to the time these petitions were filed. See Sample, 1996 WL 551754, at \*6-8. Accordingly, we remanded the Brady claims to the trial court "for further consideration." Id. at \*8. We instructed the trial court that "[i]f the [Defendants'] allegations are substantiated, and no statutory defenses are shown to apply, [it] shall consider the merits of the [Brady claims] in accordance with the applicable authority." Id. (emphasis added).

With respect to the Middlebrooks error, we went further and determined that the Defendants' allegations in this regard were not time-barred. Id. at \*9. Accordingly, we directed the trial court to determine whether the Middlebrooks error was harmless beyond a reasonable doubt, pursuant to the analysis set forth in State v. Howell, 868 S.W.2d 238, 260-61 (Tenn. 1993). See Sample, 1996 WL 551754, at \*10.

On remand, the trial court dismissed both Defendants' Brady claims as time-barred, relying on Wright v. State, 987 S.W.2d 26, 28-30 (Tenn. 1999). It further found that the Middlebrooks error was harmless beyond a reasonable doubt. Therefore, the trial court denied both petitions. This appeal as of right from the trial court's decisions on both issues followed. For the reasons set forth below, we now affirm the trial court's judgment.

## THE BRADY CLAIMS

---

[3] Because these petitions were filed prior to May 10, 1995, the applicable statute of limitations is three years. See Tenn. Code Ann. § 40-30-102 (repealed 1995); Abston v. State, 749 S.W.2d 487, 488 (Tenn. Crim. App. 1988).

In dismissing the Defendants' Brady claims as barred by the statute of limitations, the trial court found that the applicable statute of limitations began to run on August 30, 1991.[4] It found further that "the petitioners were not denied a reasonable opportunity to have the [Brady] issues heard and litigated," relying on Wright v. State, 987 S.W.2d at 30. The Defendants argue that the trial court erred for the following reasons:

1.     In the previous appeal of this matter, this Court ruled that the Defendants had overcome the statute of limitations issue and remanded this matter for an evidentiary hearing on the Brady claims;

2.     The statute of limitations did not commence on August 30, 1991; and

3.     The trial court misapplied relevant case law in determining whether the statute of limitations should be strictly applied.

Upon our review of the record and the relevant case law, we affirm the trial court's dismissal of the Defendants' Brady claims as time-barred.

We first address the Defendants' contentions that the trial court misconstrued this Court's ruling on the prior appeal of this matter. In our initial consideration of the Defendants' petitions, we were faced with a summary dismissal of Sample's petition on the ground of lack of jurisdiction and a summary dismissal of McKay's petition upon strict application of the three-year statute of limitations. See Sample, 1996 WL 551754, at *1. Apparently, the trial court ruled that McKay's petition was time-barred without analyzing whether the statute of limitations should have been suspended under Burford v. State, 845 S.W.2d at 204. Upon our review of the petitions, we concluded that Sample's petition was properly before the trial court. Sample, 1996 WL 551754, at *2. We further found that the Defendants' allegations that the State had knowingly used false testimony and suppressed exculpatory evidence "clearly stated constitutional grounds for relief." Sample, 1996 WL 551754, at *4. However, "[t]he key issues were whether the grounds were viable at this stage of the post-conviction proceedings." Id. That is, were the Defendants entitled to an evidentiary hearing, or were the petitions barred by the procedural defenses of waiver, previous determination, or the statute of limitations? We held that a remand was necessary because "the trial court did not give due consideration to these key issues," id., and concluded that upon remand, "[i]f the [Defendants'] allegations are substantiated, and no statutory defenses are shown to apply, the trial court shall consider the merits of the issues in accordance with the applicable authority." Id. at *8 (emphasis added). Accordingly, on remand, the trial court focused its efforts on determining whether the Defendants' petitions were subject to the strict application of the statute of limitations

---

[4]This is the date on which the Tennessee Court of Appeals filed its opinion in Rebecca Freeman v. William Jeffcoat, No. 01A01-9103-CV-00086, 1991 WL 165802 (Tenn. Ct. App., Nashville, Aug. 30, 1991), which permitted a post-conviction petitioner access to police records. See id. at *7.

under Burford and its progeny. The trial court did not err in undertaking this analysis. The Defendants' contention that we had previously ruled that the statute of limitations did not apply to their petitions is incorrect.[5] This issue is without merit.

The trial court did err, however, in finding that the statute of limitations on the Brady claims commenced on August 30, 1991. There are not different statutes of limitations applicable to post-conviction petitions, depending on the issues raised therein. At the time these post-conviction petitions were filed, they were subject to a single three-year limitations period. See Tenn. Code Ann. § 40-30-102 (repealed 1995). The limitations period for these Defendants commenced on July 1, 1986 and expired on July 1, 1989. See id.; Abston v. State, 749 S.W.2d 487, 488 (Tenn. Crim. App. 1988). Thus, the issue became whether due process required that the statute of limitations not be applied to the Brady claims raised in these petitions. See Burford, 845 S.W.2d at 204. Our supreme court has refused to apply a "secondary" limitations period to claims that arise after the statute of limitations has expired. See Wright, 987 S.W.2d at 30. Accordingly, the trial court was incorrect in its holding that the three-year statute of limitations period commenced on August 30, 1991. This error does not, however, entitle the Defendants to the relief they seek.

We turn now to the trial court's holding that, under Wright, the Defendants' Brady claims are time-barred. We begin our analysis of this issue with Burford. In that case, Burford was serving a fifty-year sentence as a persistent offender. 845 S.W.2d at 205. Several of the convictions upon which his enhanced sentence was based were subsequently found void. Id. Thereafter, Burford filed for post-conviction relief, alleging that the fifty-year sentence was excessive in light of the voided convictions. Id. Burford's claim for relief under the post-conviction statute, based upon the voiding of his convictions, did not arise until approximately ten months before the applicable three-year statute of limitations expired. Id. at 209. Burford did not actually file his petition for post-conviction relief until approximately nine months after the limitations period expired. Id. at 211 (Daughtrey, J., concurring). Our supreme court refused to apply the limitations period strictly, finding that Burford had "found himself caught in a procedural trap and unable to initiate litigation . . . despite the approach of the three-year limitation." Id. at 208. In determining whether to strictly apply the statute of limitations, the court applied a balancing test: whether the State's interest in the administrative efficiency and economy created by a time-bar was outweighed by Burford's interest

---

[5]Even if we construed our prior opinion as holding that the Defendants' Brady claims were not time-barred, the Defendants would still not prevail. Although the "law of the case" would then favor the Defendants' position, that doctrine is not without exceptions. "[W]hen an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. [One of the] limited circumstances which may justify reconsideration of an issue which was decided in a prior appeal . . . [is where] the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal." Memphis Publ'g Co. v. Tennessee Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998)(citations omitted). Our prior opinion was filed in 1996. Wright was filed in 1999. We believe the Defendants' construction of our prior decision is contrary to Wright, and the issue of whether the Defendants' Brady claims are time-barred is therefore subject to reconsideration.

against serving an excessive sentence in violation of his constitutional rights. <u>Id.</u> at 209. In conducting this test, the court noted:

> There is nothing stale or fraudulent about the petitioner's claim. Although he filed his petition outside the time limits provided by the statute of limitations, there is no difficulty here with the availability of witnesses or the memories of witnesses. Nor is there a problem with respect to a groundless claim generating excessive costs. It is abundantly clear that the petitioner had a valid claim to have his sentence reduced, and all the [trial] court will have to do is examine the record of the Wilson County proceedings. The [trial] court can then resentence Burford . . . . Accordingly, we find that the governmental interest represented by Tenn. Code Ann. § 40-30-102 is not served by applying the statute to bar Burford's petition.

<u>Id.</u>

Our supreme court revisited this issue in <u>Sands v. State</u>, 903 S.W.2d 297 (Tenn. 1995). In <u>Sands</u>, the court held,

> In applying the <u>Burford</u> rule to specific factual situations, courts should utilize a three-step process: (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," against the State's interest in preventing the litigation of "stale and fraudulent claims."

<u>Id.</u> at 301 (citations omitted).

In <u>Caldwell v. State</u>, 917 S.W.2d 662 (Tenn. 1996), our supreme court once again visited this issue, and restated the rule from <u>Burford</u> as requiring that "the interests of both parties [be weighed so as] to determine if due process requires the suspension of the limitations period so as to afford the petitioner a reasonable opportunity to litigate the claim." <u>Id.</u> at 666. In <u>Caldwell</u>, the defendant was challenging his arrest as pretextual. The court found the defendant's interest to be something less than the personal trial right that had been at issue in <u>Burford</u>, and it noted that even if Caldwell was successful in his challenge and was thereby able to suppress evidence, his conviction would not necessarily be reversed. <u>Id.</u> at 667.

The court further noted that the State's interest in this case was "much stronger than in Burford." Id. at 666. Because the events at issue had occurred fifteen years earlier, the State's concern with litigating stale claims was significant. Id. The State's interest in preventing excessive cost was also more pronounced here than in Burford. Id. In Caldwell, the defendant had to "successfully litigate several issues relating to the allegedly pretextual arrest before he receives any benefit at all from the claim." Id. Accordingly, the court declined to suspend the statute of limitations and dismissed the defendant's petition for post-conviction relief as time-barred.

Finally, in Wright v. State, 987 S.W.2d 26 (Tenn. 1999), the court considered the application of Burford to a later-arising Brady claim such as we face in the instant cases. Wright had been convicted in 1985 of two counts of first degree premeditated murder; he was sentenced to death on one of these convictions. Id. at 27. The three year statute of limitations for his post-conviction claims for relief expired in August 1991. Id. at 28.

Wright filed for post-conviction relief on January 27, 1995, alleging that the State had withheld exculpatory evidence in violation of Brady v. Maryland. Id. at 27. He argued that his claim for relief did not arise until January 29, 1992, when the Tennessee Court of Appeals filed its decision in Capital Case Resource Center v. James G. Woodall, No. 01A01-9104-CH-00150, 1992 WL 12217 (Tenn. Ct. App., Nashville, Jan. 29, 1992).[6] Id. In Woodall, the Middle Section of the Court of Appeals held that police investigative files regarding a case under collateral attack were subject to disclosure under the Tennessee Public Records Law. 1992 WL 12217, at *5. Using Woodall, Wright had apparently obtained information previously unavailable to him, and he claimed part of it to be exculpatory within the meaning of Brady v. Maryland. Wright, 987 S.W.2d at 27. Wright argued that, under Burford, the three-year statute of limitations applicable to post-conviction petitions should not apply to his cause of action. Id. at 28.

Our supreme court agreed that Wright's Brady claim was "later-arising" under Sands and Caldwell. Id. at 29. It then restated the test for determining whether a later-arising claim should be subject to strict application of the statute of limitations:

> To determine whether a petitioner was denied a reasonable
> opportunity to present a claim, a court must balance the liberty
> interest in collaterally attacking the constitutional violations

---

[6]We are somewhat mystified by this argument, which the Defendants also raise in these cases. Under Brady v. Maryland, if the prosecution had the exculpatory information prior to trial, and it was requested, then the prosecution was under a duty at that time to disclose the information. "This duty to disclose extends to all "favorable information" irrespective of whether the evidence is admissible." Wooden v. State, 898 S.W.2d 752, 755 (Tenn. Crim. App. 1994). The prosecution has the responsibility to disclose statements of witnesses favorable to the defense. Id. We would be surprised if the prosecution in a murder case did not have copies of the police records which are the subject of the Jeffcoat and Woodall opinions. Thus, while a defendant may not discover his claim for relief until long after his or her trial, it actually arises upon the prosecution's violation of its duty to disclose prior to trial. The key issue in a case such as this one is whether the prosecution's continued failure to disclose — thereby preventing the defendant from discovering the violation of his or her constitutional rights — should toll the statute of limitations during the period the exculpatory information is suppressed.

occurring during the conviction process against the State's legitimate interest in preventing the litigation of stale and fraudulent claims.

Id. at 28 (citations omitted). Applying this test to the case before it, the court made the following determinations:

> We initially observe that the right asserted by Wright -- the denial of due process resulting from the prosecution's suppression of exculpatory evidence -- is a personal trial right directly relating to the justice or integrity of the conviction and sentence. It is, therefore, more similar to the liberty interest asserted in Burford than the interest in Caldwell.
>
> The other side of the scale, however, weighs heavily in favor of the legitimate interests of the State. The post-conviction suit filed by Wright was filed ten years after the commission of the offense; nearly six and one-half years after Wright's conviction became final; three and one-half years after the three-year post-conviction statute of limitations expired; and nearly three years after the Court of Appeals decided in Woodall that police investigative files were not exempt from the Public Records Act.[7]
>
> As in Caldwell, this passage of time is directly related to the manner and means of litigating Wright's issue. The availability of critical witnesses and their ability to recall and relate details as to the alleged suppression of exculpatory evidence and the facts of this offense are immediate and significant concerns. Wright's mere allegation that the prosecution suppressed exculpatory evidence does not warrant relief. Instead, Wright must establish that favorable evidence existed, that it was material to the defense, and that it was, in fact, suppressed by the prosecution. Accordingly, as in Caldwell, raising this issue at this stage of the proceedings, would require extensive, possibly expensive litigation.

Id. at 30.

Like Wright, the Defendants in these cases claim they did not obtain the information they now allege is exculpatory until after the Woodall decision in 1992. The three year statute of limitations applicable to their post-conviction petitions expired on July 1, 1989. Thus, the

---

[7]The Wright opinion does not indicate how much time passed after the petitioner received the alleged exculpatory information before he filed his petition.

Defendants' Brady claims are "later-arising" as defined in Sands.[8] And, like Wright's and Burford's, the Defendants' Brady claims are based on personal trial rights directly relating to the justice or integrity of their convictions. See id.

As it did in Wright, however, "[t]he other side of the scale . . . weighs heavily in favor of the legitimate interests of the State." Id. These post-conviction petitions were filed more than thirteen years after the offenses were committed; more than ten years after the Defendants' convictions became final; five and one-half years after the three-year statute of limitations expired; three years after the Woodall decision; and more than one year after the Defendants finally got the information which forms the basis of their Brady claims.

The Defendants argue strenuously that Wright is distinguishable from their cases, stating that these delays are not their fault because they actively sought the exculpatory information since 1982 but were continuously "sandbagged" by the State until 1993. They argue that the petitioner in Wright "had apparently made no such attempts." Our review of Wright, however, reveals no mention of whether Wright had earlier sought the information he eventually obtained; more importantly, it reveals no indication that, even if Wright had done so, the court's holding would have been different.

The Defendants also argue that their Brady claims are supported by significant proof already submitted with their pleadings, in contrast to "Wright's mere allegation that the prosecution suppressed exculpatory evidence." Wright, 987 S.W.2d at 30. We believe the Defendants misconstrue this portion of the Wright decision. The supreme court was pointing out that Wright was not entitled to relief merely on the basis of his pleadings: rather, he must first establish at an evidentiary hearing that "favorable evidence existed, that it was material to the defense, and that it was, in fact, suppressed by the prosecution." Id. The Defendants herein would have to prove — at an evidentiary hearing — exactly the same things to be entitled to a new trial. Such proof here — as in Wright's case — "would require extensive, possibly expensive litigation." Id. The State has made it clear that it does not agree with the Defendants that the material which forms the basis of their Brady claims provides the Defendants with any grounds for relief.

In short, we find ourselves constrained to apply the holding of Wright to the Defendants' petitions and affirm the trial court's holding that they are time-barred. Nevertheless, we take this opportunity to voice our concerns about the result which we believe to be mandated by the Wright decision. We begin by emphasizing that we have made no findings that the State actually secreted or withheld exculpatory information. The issue before us is whether the Defendants are entitled to an evidentiary hearing concerning their allegations of Brady violations.

Returning to the starting point of this issue in Burford, we note that Justice Daughtrey foresaw this very situation in her concurring opinion in that case:

---

[8]See, however, footnote six, above.

> Hypothetically, of course, legitimate grounds for relief might come to light long after the three-year [statute of limitations] has run, as in the case of suppression of material evidence by the prosecution that is concealed for many years after the trial. Through no fault of his or her own, an inmate in such a situation would be foreclosed from any type of post-conviction relief other than, perhaps, executive clemency.

Burford, 845 S.W.2d at 211. She continued: "While I adhere enthusiastically to policies of finality and judicial economy, I cannot accept such a narrow interpretation of the 1986 amendment to the Post-Conviction Act." Id.

In both the case at bar and in Wright, the petitioners' allegations are that the State withheld exculpatory evidence in violation of their constitutional rights under Brady v. Maryland.[9] Wright appears to stand for the proposition that, if the State is successful in withholding such evidence for a long enough time, it can then successfully argue that the passage of such a lengthy time should keep the evidence forever out of court. Under Wright, the State's possible incentive to conceal evidence favorable to the defense for as long as it possibly is apparent.[10]

Failure to state the factual basis for the grounds for relief in a post-conviction petition results in the summary dismissal of the petition. Tenn. Code Ann. § 40-30-206(d). Without the withheld Brady material, a defendant cannot assert a Brady violation. Therefore, the State's violation of its duty to disclose exculpatory information within the relevant statute of limitations period may effectively render a defendant incapacitated to timely raise a Brady claim. It is difficult to articulate a meaningful distinction between this type of incapacity and the type recognized by our supreme court in Seals v. State, 23 S.W.3d 272 (Tenn. 2000). In Seals the court recognized that "due process requires tolling of the statute of limitations where a petitioner is denied the reasonable opportunity to assert a claim in a meaningful time and manner due to mental incompetence." Id. at 279. The basis for this holding was that, "'if the petitioner was mentally incompetent, and therefore legally incapable, he would be denied any opportunity to assert his constitutional rights in a post-conviction petition, unless the period of limitations was suspended during his mental incompetence.'" Id. at 278 (quoting Watkins v. State, 903 S.W.2d 302, 307 (Tenn. 1995)) (emphasis changed). The petitioner in Seals was legally incapable of raising his post-conviction claims due to his mental incompetence: an unfortunate condition beyond his control. Here, the Defendants allege that they

---

[9]And it is this exculpatory evidence which also supports the Defendants' claims that the State knowingly presented false testimony at trial.

[10]While the Jeffcoat and Woodall decisions made available police records post-conviction, the prosecution is bound under Brady to provide exculpatory information upon request even before a defendant's trial. That a defendant may have finally obtained exculpatory material after either of these cases was filed should not exonerate the State from any improper failure to have provided it earlier.

were legally incapable of raising their claims due to the State's alleged refusal to provide them with constitutionally required factual information: a factual situation equally beyond their control.

In spite of our concern that the Wright decision may be too heavily weighted in favor of the State, we are not unmindful of the potential for abuse that would arise were our supreme court to overrule Wright and hold that a defendant was entitled to an evidentiary hearing upon the mere filing of a Brady claim, irrespective of how much time had passed since conviction. We therefore examine the merits of the doctrine of "equitable estoppel" which could be used to screen cases such as this one. Equitable estoppel "requires that the plaintiff's failure to bring the action within the statutory period of limitations be attributable to deception or misconduct on the part of the [opposing party]." Norton v. Everhart, 895 S.W.2d 317, 321 (Tenn. 1995). Under equitable estoppel, the complaining defendant would therefore have to make an initial showing that the State had engaged in misconduct or deception which made it impossible to have filed a timely post-conviction petition. Such a showing, we presume, would require the defendant to submit with his petition documentation setting forth his attempts to obtain the alleged Brady information as well as evidence of the State's bad-faith refusal to cooperate. The trial court could then add this information to its calculus in determining whether the statute of limitations should be strictly applied to the defendant's claim. While this approach may seem to impose a fact-finding process in order to determine whether there should be a fact-finding hearing, such an extra layer could better serve the ends that due process is meant to achieve.[11]

"[D]ue process embodies the concept of fundamental fairness." Seals, 23 S.W.3d at 277. "[D]ue process requires that a potential litigant be provided an opportunity for the 'presentation of claims at a meaningful time and in a meaningful manner.'" Id. at 278 (quoting Burford, 845 S.W.2d at 207).

The serious ramifications of the Wright decision in death penalty cases are apparent. If the exculpatory evidence clearly exonerated a defendant, yet was withheld until long after the statute of limitations had expired, Wright would appear to bar a defendant from presenting the evidence in court based upon the need for finality and economy.

## THE MIDDLEBROOKS ERROR

We turn now to the Defendants' contentions that they are entitled to a new sentencing hearing because their death sentences are based in part on the use of an invalid aggravating circumstance.

---

[11]The doctrine of "equitable tolling" would also address the instant problem. Under equitable tolling, a defendant's failure to timely file his post-conviction petition would be excused "only if he shows that he 'could not, despite the exercise of reasonable diligence, have discovered all the information he needed in order to be able to file his claim on time.' In other words, '[e]xtraordinary circumstances far beyond the litigant's control must have prevented timely filing.'" United States ex rel Rice v. Haws, 2000 WL 1508242, at *5 (N.D. Ill. 2000) (quoting Taliani v. Chrans, 189 F.3d 597, 597-98 (7th Cir. 1999) and United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000)) (noting that the statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 is subject to equitable tolling). However, our supreme court has previously declined to adopt the doctrine of equitable tolling. See Norton, 895 S.W.2d at 321.

In sentencing each Defendant to two death penalties for the two murders they jointly committed, the jury relied upon the following three aggravating circumstances:

> 1. The defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder;
>
> 2. The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and
>
> 3. The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb ("the felony murder aggravator").

Tenn. Code Ann. § 39-2404(i)(3), (6), (7) (Supp. 1981). The jury applied a fourth aggravating circumstance to McKay: that he had been previously convicted of a felony which involved the use or threat of violence to the person. Id. § 39-2404(i)(2).

In State v. Middlebrooks, our supreme court held that application of the felony murder aggravator to enhance a sentence for a felony murder conviction was unconstitutional. 840 S.W.2d at 346. Accordingly, the jury's reliance on the felony murder aggravator in determining McKay's and Samples' sentences was error. Such an error is harmless, however, if an appellate court finds "beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid felony murder aggravating factor." Howell, 868 S.W.2d at 262.[12] Our review of the Middlebrooks error is de novo. King v. State, 992 S.W.2d 946, 949 (Tenn. 1999).

Howell instructs us that, when conducting our harmless error review of the Middlebrooks issue, we must review the record for those factors potentially influencing the sentence ultimately imposed. 868 S.W.2d at 260-61. These factors include, but are not limited to, "the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence." Id. at 261.

---

[12]The Defendants contend that the Howell analysis of a Middlebrooks error is not applicable to death penalties imposed under the statute which applied to their sentences. See Tenn. Code Ann. § 39-2404 (Supp. 1981). We respectfully disagree. See, e.g., Harries v. State, 958 S.W.2d 799, 803 (Tenn. Crim. App. 1997) (applying Howell analysis to Middlebrooks error committed in sentencing defendant under Tenn. Code Ann. § 39-2404 for murder committed in 1981). This issue is without merit.

-12-

Initially, a brief review of the facts proved during the guilt phase of the trial is helpful. At about 11:00 p.m. on August 29, 1981, Melvin Wallace, Jr., walked into the L & G Sundry Store in Memphis. Inside, he found two clerks whom he knew (Benjamin Cooke and Steven Jones) and the two Defendants, whom Wallace did not know. As he waited for the sandwiches he had ordered, Wallace saw McKay put a gun to Cooke's head. Wallace ran for the door, and Sample said, "Halt, nigger. I'll shoot." Wallace was unable to immediately stop, and Sample shot him in the thigh. Wallace fell to the floor. As he lay there, he heard Sample say, "I ought to kill all you son-of-a-bitches." Sample kept asking Jones for the money. Jones told him he'd given him everything he had. Sample said, "Give me everything below and behind the counter." Jones said he "don't have no more." Sample repeated, "I ought to kill all you son-of-a-bitches." Sample then said, "Kill every son-of-a-bitch in here." According to Wallace, Sample and McKay then "went to shooting." Cooke was shot twice and was killed by a bullet to the back of his head. Jones was shot at least twice and was also killed by a bullet to the back of his head. After the Defendants shot Cooke and Jones, Sample came over to the prone Wallace, said "This nigger ain't dead," and shot him in the back. He then put his gun to Wallace's head, but the gun misfired. Wallace started wrestling with Sample and the gun went off next to Wallace's head. Wallace lapsed into unconsciousness. When he woke up, he heard one of the Defendants say, "Let's get the hell out of here." Wallace later identified the Defendants from line-ups.

We turn first to the jury's finding that each of these Defendants — with respect to each murder — knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder. This aggravating factor "contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based." State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000) (citations omitted). It has most frequently been applied "where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present." Id. at 313-14 (quoting State v. Burns, 979 S.W.2d 276, 280 (Tenn. 1998)). The proof at trial established that McKay and Sample were acting jointly to kill three people, and they fired at least seven gunshots between them. Thus, while the Defendants were shooting and murdering Cooke – Jones and Wallace were at a great risk of death; and while they were shooting and murdering Jones – Cooke and Wallace were at a great risk of death.[13]

Defendants contend that this analysis results in "double counting" because it counts each murder victim as being one of the two persons put at great risk during the other victim's murder. That is, the Defendants construe the aggravating circumstance as referring to "two or more persons, other than the victims murdered" (emphasis added). We respectfully reject the Defendants' argument, finding that this analysis favors form over substance. If the Defendants had succeeded

---

[13]Arguably, each Defendant was also put at a great risk of death by the other Defendant's actions of firing his gun in the store. There was no proof at trial, however, that Sample was ever in McKay's line of fire or vice versa, or that either Defendant fired his gun randomly so as to endanger the other Defendant. Rather, the proof established that McKay and Sample took pains to execute Cooke and Jones by shots to the backs of their heads, and they tried to do the same to Wallace.

in killing only one of the victims, there would be no question about the applicability of this factor: that is, the Defendants would each be eligible for the death penalty based on this factor alone.[14] Under the Defendants' reasoning, this factor alone does not make them eligible because they succeeded in killing two of the victims. That the Defendants managed to kill two of three people — instead of only one of three — should not make them less eligible for the death penalty. The jury properly applied this aggravating factor to both of the Defendants' sentences.

The proof that the Defendants committed the murders in order to avoid their arrest or prosecution was also very strong. To establish this aggravating circumstance, the State needed to prove only that avoidance of arrest or prosecution was "one" of the motives for the killing. See State v. Henderson, 24 S.W.3d at 314. Here, the evidence established that the Defendants wore no disguise while committing these offenses;[15] they deliberately killed two of the three eyewitnesses — and tried to kill the third — without provocation; and they fled the scene after the third eyewitness appeared dead. With respect to McKay, Charles Malone testified at trial that McKay told him the next day to purchase a bus ticket to Chicago for McKay under a false name, supporting the inference that McKay was still attempting to avoid apprehension. Malone also testified that, when he, McKay and Sample were subsequently approached by the police, McKay stated, "It look like we're going to have to kill some police, man." Clearly, the Defendants were determined to avoid their arrest and prosecution, and were willing to murder multiple persons in order to do so. The jury properly applied this aggravator to both of Defendants' sentences.

The jury also applied a third aggravating circumstance to McKay's sentences: that he had previously been convicted of another felony involving the use or threat of violence to the person. During the sentencing hearing, the State submitted undisputed proof that McKay had been convicted

_____

[14]We acknowledge that a majority of a panel of this Court has found that this aggravating circumstance cannot be applied vicariously to one defendant for the actions of his accomplice. See Erskine Leroy Johnson, No. 02C01-9707-CR-00292, 1999 WL 608861, at *11 (Tenn. Crim. App., Jackson, Aug. 12, 1999), perm. appeal granted (Tenn. 2000). In Johnson, the defendant and another man entered a grocery store to rob it. Both men carried guns. The defendant fired more than one shot, killing the owner of the store. Another shot was fired, which grazed a customer. The defendant was convicted of felony murder and sentenced to death, in part on the basis that he knowingly created a great risk of death to two or more persons, other than the victim murdered, during his act of murder. See State v. Johnson, 762 S.W.2d 110, 119 (Tenn. 1988). On post-conviction, the defendant claimed that suppressed exculpatory evidence indicated that he had not fired the shot which grazed the customer and, presumably, endangered other persons. 1999 WL 608861, at *8. The undersigned judge dissented from the majority's holding, stating "this Defendant, based on his participation in this armed robbery and felony-murder, is responsible for the acts of his co-defendant such that this aggravating circumstance would apply even if the co-defendant fired the shot which grazed the customer." (Welles, J., dissenting) In the cases before us, the proof at trial was not clear about who shot and killed whom. The proof was clear, however, that these Defendants were acting jointly to kill everyone else in the store. We find that, under the circumstances of this case, this aggravating factor should apply to both Defendants, regardless of who fired the fatal shots.

[15]We may infer this fact from Wallace's description of the scene as he entered the store and his ability to later identify the Defendants from a line-up.

of a 1974 robbery with a deadly weapon.[16]  We note that our supreme court in Howell found this aggravating circumstance "more qualitatively persuasive and objectively reliable than others." 868 S.W.2d at 261.

Therefore, we find that two aggravating circumstances were properly applied to each of Sample's sentences, and three aggravating circumstances were properly applied to each of McKay's sentences.  We further find that each of these aggravating circumstances was strongly supported by the proof.  We turn now to the evidence admitted to support the invalid felony murder aggravator; the efficacy of the mitigating evidence offered on behalf of the Defendants; and the prosecutors' arguments at sentencing.

With respect to the evidence admitted to establish the felony murder aggravator, we must determine whether the proof was "materially inaccurate or admissible only to support the invalid aggravator, or whether the evidence was otherwise admissible in either the guilt or sentencing phases of the proceeding."  Howell, 868 S.W.2d at 261.  Here, the State offered no evidence at the sentencing hearing other than proof of McKay's prior conviction.[17]  Thus, the proof of the felony murder aggravator was admitted in conjunction with proving the Defendants' guilt of felony murder.  The proof was not materially inaccurate, nor was it admissible only to support the felony murder aggravator.  Therefore, we find that the admission of the evidence supporting the invalid aggravator was proper.

McKay testified on his own behalf, explaining to the jury that he had found God during his previous stay in prison; that he had seen the error of his ways while there and straightened himself out; and that he hadn't murdered the victims.  McKay's sister and mother also testified on his behalf, explaining that McKay was not a violent person and that he had been affected by his parents' marital problems.  They pleaded with the jury to spare his life.  We find this proof of mitigation to be not particularly strong.

Two of Samples' foremen testified on his behalf, stating that he was an "exceptionally good" employee, that he was "very conscientious," and that he had "no problem with the people" he oversaw.  Sample's sister testified, explaining that Sample had left school after the ninth grade to start working.  Samples' mother-in law and father-in-law were also called and testified as to Sample's good character and as to his good qualities as husband, father, and son-in-law.  His mother testified, stating that Sample was a good son and also asking the jury to spare his life.  Sample testified on his own behalf, stating that he did not commit these crimes and asking the jury to spare his life for the sake of his son and wife.  We find this evidence offered in mitigation to be of some weight.

---

[16]This is the only proof that the State introduced during the sentencing hearing.  It relied on the proof introduced during the guilt phase of the trial for the remaining aggravating circumstances.

[17]The State also asked a witness testifying on behalf of Sample if he knew that Sample had "been convicted of murdering a sixteen year old clerk and a twenty-four year old clerk in the perpetration of a robbery?"

-15-

The State's opening statement was very brief, and basically just mentioned the four aggravating circumstances it intended to rely upon. During closing argument, the prosecution focused primarily on explaining why the Defendants' proof did not constitute mitigating circumstances that outweighed the four aggravating factors. While the prosecution did mention the felony murder aggravator several times, this issue was not dwelled upon or given undue emphasis.

With respect to McKay's sentences, then, we find three remaining valid aggravating circumstances, all of which were strongly established, and mitigating circumstances of negligible weight. We find that no improper evidence was introduced to support the felony murder aggravator and that the State's argument did not unduly emphasize this invalid aggravating circumstance. Accordingly, we find beyond a reasonable doubt that the jury would have imposed the death sentence on McKay for each murder absent consideration of the felony murder aggravating circumstance. We therefore find no error in McKay's sentencing that requires a new sentencing hearing.

Similarly, with respect to Sample's sentences, we find two remaining valid aggravating circumstances, both of which were strongly established, and mitigating circumstances of slight weight. No improper evidence was introduced to support the felony murder aggravator and the State's argument did not unduly emphasize this invalid aggravating circumstance. Accordingly, we find beyond a reasonable doubt that the jury would have imposed the death sentence on Sample for each murder absent consideration of the felony murder aggravating circumstance. We therefore find no error in Sample's sentencing that requires a new sentencing hearing.

## CONCLUSION

Under our supreme court's decision in Wright v. State, we hold that the Defendants' Brady claims in their petitions for post-conviction relief are barred by the statute of limitations. We further find that the Middlebrooks error committed in their sentencing hearing was harmless beyond a reasonable doubt. Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

-16-