# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

## STATE OF TENNESSEE  v.  KENNATH ARTEZ HENDERSON

### Appeal from the Circuit Court for Fayette County
### No. 4465    Hon. Jon Kerry Blackwood, Judge

---

### No. W1998-00342-SC-DDT-DD  —  Decided July 10, 2000
### FOR PUBLICATION

---

The sole issue in this automatic review of the appellant's death sentence is whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the appellant and the nature of his crime.  The Court of Criminal Appeals held that the sentence of death was a proportionate penalty given the nature of the defendant's crime and the individual circumstances surrounding the defendant.  After an extensive review of the record and the applicable case authorities, we also hold that the sentence of death in this case is not excessive and is a proportional penalty.  The judgment of the Court of Criminal Appeals is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals is Affirmed**

BARKER, J., delivered the opinion of the court, in which ANDERSON, C.J., and HOLDER, J., joined. BIRCH, J., filed a dissenting opinion.  DROWOTA, J., not participating.

C. Michael Robbins, Memphis, Tennessee; Mike Mosier, Jackson, Tennessee, for the appellant, Kennath Artez Henderson.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Tonya Miner, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

At the time of the events giving rise to this case, the appellant, Kennath Henderson, was incarcerated at the Fayette County Jail serving consecutive sentences for felony escape and aggravated burglary.  On April 26, 1997, as the appellant was planning an escape from jail, he had a .380 semi-automatic pistol smuggled into the jail through his girlfriend.  A couple of days later, the appellant requested dental work on a tooth that needed to be pulled, and an appointment was made for May 2 with Dr. John Cima, a dentist practicing in Somerville.  Dr. Cima had practiced

dentistry in Somerville for more than thirty years, and he had often seen inmate patients. In fact, this was not the appellant's first visit to see Dr. Cima.

On May 2, 1997, Deputy Tommy Bishop, who was serving in his official capacity as a transport officer for the Fayette County Sheriff's office, took the appellant and another inmate, Ms. Deloice Guy, to Dr. Cima's Office in a marked police car. Upon their arrival at the dentist's office, Dr. Cima placed the appellant and Ms. Guy in separate treatment rooms, and each patient was numbed for tooth extraction. Deputy Bishop remained in the reception area and talked with the receptionist during this time.

When Dr. Cima and his assistant returned to the appellant's treating room to begin the tooth extraction, the appellant pulled out his .380 pistol. Dr. Cima immediately reached for the pistol, and he and the appellant struggled over the weapon. During this brief struggle, Dr. Cima called out for Deputy Bishop, and the deputy hurried back to the treatment room. Just as the deputy arrived at the door, the appellant regained control of the pistol and fired a shot at Deputy Bishop, which grazed him on the neck. Although not fatal, this shot caused the deputy to fall backwards, hit his head against the doorframe or the wall, and then fall to the floor face down, presumably unconscious.

The appellant then left the treating room and came back with the receptionist in his custody. The appellant reached down and took Deputy Bishop's pistol, and he took money, credit cards, and truck keys from Dr. Cima. The appellant then ordered Dr. Cima and the receptionist to accompany him out of the building, but just before he turned to leave the building, the appellant went back to the treatment room, leaned over Deputy Bishop, and shot him through the back of the head at point-blank range. The deputy had not moved since first being shot in the neck moments earlier and was still lying face-down on the floor by the door to the treatment room when the appellant fatally shot him.

Once outside of the office, the appellant was startled by another patient, and Dr. Cima and his receptionist were able to escape back into the office.[1] Once inside, Dr. Cima locked the door and called the police. The appellant, in the meantime, stole Dr. Cima's truck and drove away at a slow speed so as not to attract any attention to himself. When police officers began to follow him, the appellant sped away, and eventually drove off the road and into a ditch. The officers took the appellant into custody, and upon searching the truck, they found the murder weapon, Deputy Bishop's gun, and personal items taken from Dr. Cima's office.

On May 13, 1997, the appellant was indicted by a Fayette County Grand Jury in a ten-count indictment, which alleged one count of premeditated murder, three counts of felony murder, two counts of especially aggravated kidnaping, and one count of attempted especially aggravated kidnaping, aggravated robbery, aggravated assault, and felonious escape. After three continuances,

---

[1] The second inmate, Deloice Guy, apparently knew nothing of the appellant's plans to escape, and she hid in her treatment room during the episode.

the appellant pled guilty on the day of trial to all of the charges except for the three counts of felony murder.

On July 13, 1998, the circuit court held the sentencing hearing, and the appellant waived his right to have a jury empaneled for purposes of determining his sentence. Several witnesses testified for the State at the sentencing hearing, including Deloice Guy, the inmate taken with the appellant to the dentist by Deputy Bishop; Dr. John Cima; Donna Feathers, Dr. Cima's dental assistant; and Peggy Riles, Dr. Cima's receptionist. In addition, Dr. O.C. Smith, a forensic pathologist, testified as to his investigation of the crime scene and of his autopsy of Deputy Bishop. Dr. Smith stated that based on his examination of Deputy Bishop's wounds, along with witness testimony, it was likely that the first shot fired by the appellant hit the deputy in the neck, and caused the deputy to hit his head against the doorframe of the examination room. Dr. Smith opined that this blow to the deputy's head could have rendered him unconscious. Moreover, Dr. Smith testified that the second shot fired by the appellant entered at the back of the deputy's head and exited near the left eye. This second shot caused "significant and severe brain damage," and the blood from this wound seeped from the skull fractures into the deputy's sinuses, and ultimately, was breathed into his windpipe. Finally, Dr. Smith testified that the bullets used by the appellant could have "easily" penetrated the thin walls of the dentist's office.

In mitigation, the appellant testified on his own behalf. According to his testimony, he was 24 years old at the time of the offense. He was a high-school graduate and has four younger brothers. While in elementary school, the appellant received numerous academic awards and certificates, and he was heavily involved in extracurricular activities and sports while in high school. Although the appellant expressed sorrow and remorse over his actions, he admitted that "[t]here's no reason" for the murder of Tommy Bishop. While he acknowledged that he extensively planned his escape from prison, including procuring the .380 pistol, his only excuse for the shooting was that he "wasn't thinking clearly that day."[2]

The appellant also testified that he had some "problems" in high school, and although he was never cited to the juvenile court, he stated that he felt like his problems were never addressed. He also testified that while in jail in 1996, he requested counseling because he "felt like [he] needed help psychologically." His mother testified, however, that she did not believe that the appellant needed any help or intervention of any kind during his high school years. In addition, the appellant's mother testified that though she remembered that the appellant requested help while in jail in 1996, she never pursued the matter because he "seemed to be doing fine when [she] talked to him."

Finally, Dr. Lynne Zager, a forensic psychologist, testified as to her findings and conclusions based on two interviews with the appellant, a personality test administered to the appellant, and other

---

[2] At one point during his attempted escape, the appellant also shot himself in the leg with his own gun resulting in a superficial flesh wound. In support of his assertion that he "wasn't thinking clearly," the appellant stated that he did not even realize that he shot himself in the thigh until the next day.

information supplied by the defense. From this pool of information, Dr. Zager concluded that the appellant was suffering from dissociative disorder at the time of the murder, and that the appellant possessed an unspecified personality disorder which exhibited some narcissistic and anti-social traits. She also testified that based upon her testing, she believed that the appellant's dissociative state began after the first shot was fired and lasted at least 24 hours following. While in this state, Dr. Zager stated that it was not uncommon for individuals to feel as though they are in a dream-like state and are not "an integral part of what the person is [really] doing." Although she refused to give an opinion as to whether the appellant was aware of his actions at the time of the murder, the appellant, in her opinion, "was [acting] under duress, and that his judgment was not adequate." In addition, while Dr. Zager considered him to be "impaired at the time," she testified that the appellant's condition at the time of the murder would not support a legal finding of insanity.

The State argued that four aggravating factors applied to warrant imposing the death sentence: (1) that the defendant created a great risk of death to two or more persons during the act of murder, Tenn. Code Ann. § 39-13-204(i)(3); (2) that the murder was committed for the purpose of avoiding an arrest, Tenn. Code Ann. § 39-13-204(i)(6); (3) that the murder was committed during the defendant's escape from lawful custody, Tenn. Code Ann. § 39-13-204(i)(7); and (4) that the murder was committed against a law enforcement officer, who was engaged in the performance of official duties, Tenn. Code Ann. § 39-13-204(i)(9).

The appellant argued that four statutory mitigating factors should be considered by the court: (1) the lack of significant criminal history by the defendant; Tenn. Code Ann. § 39-13-204(j)(1); that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, Tenn. Code Ann. § 39-13-204(j)(2); (3) that the defendant acted under extreme duress; Tenn. Code Ann. § 39-13-204(j)(6); and (4) that the murder was committed while the defendant's mental capacity, while not deficient to the point of raising a defense, was substantially impaired, Tenn. Code Ann. § 39-13-204(j)(8). In addition, the defense argued for application of an additional non-statutory mitigating circumstance, *i.e.*, that the failure to recognize and treat the mental health disorders of the defendant allowed such to remain untreated by any form of intervention.

At the conclusion of the hearing, the circuit court found that all four of the aggravating circumstances were proven beyond a reasonable doubt by the State. Although the circuit court did not make a specific finding as to which mitigating circumstances were supported by the evidence,[3] the court found that the aggravating circumstances had been proven beyond a reasonable doubt to "outweigh the mitigating circumstances." The circuit court then imposed the sentence of death for the premeditated murder of Deputy Tommy Bishop.[4]

---

[3] The circuit court did not make any finding of mitigating circumstance on the record or list any such circumstances in the capital case report as required by Tennessee Supreme Court Rule 12.

[4] The circuit court also sentenced the appellant to 20 years for especially aggravated kidnaping, 20 years for a second count of especially aggravated kidnaping, 8 years for aggravated

On appeal to the Court of Criminal Appeals, the sole issue raised by the appellant was whether the sentence of death was excessive and disproportionate to the offense committed. In affirming the sentence imposed by the circuit court, the Court of Criminal Appeals stated that "[o]ur review of this case in conjunction with other similar cases convinces us that the death penalty in this case is not disproportionate to the penalty imposed in other similar cases." Pursuant to our statutory obligation under Tennessee Code Annotated section 39-13-206(c)(1) (1997), we conduct our own comparative proportionality review, to review whether the sentence of death was arbitrarily imposed, and to determine whether the evidence supports the trial court's findings with respect to the statutory aggravating circumstances. We also undertake to review whether the evidence supports a finding that the aggravating circumstances outweigh the mitigating circumstance beyond a reasonable doubt.

Although no other issues in this case have been presented by the appellant, either in his brief or in argument before this court, we have carefully examined the record and have determined that no other reversible error exists. Further, after reviewing the testimony and evidence presented at the sentencing hearing along with the applicable legal authorities, we agree with the Court of Criminal Appeals that the sentence of death in this case has not been arbitrarily imposed and that it is not disproportionate to the sentence imposed in similar cases. We also hold that the evidence supports the trial court's findings concerning the applicable aggravating circumstances and that these aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Accordingly, we affirm the judgment of the Court of Criminal Appeals and the sentence imposed by the trial court.

## REVIEW OF AGGRAVATING AND MITIGATING CIRCUMSTANCES

As part of our statutory duty pursuant to Tennessee Code Annotated section 39-13-206(c)(1), we review all capital cases to determine whether the evidence supports the trial court's finding of aggravating circumstances and whether these aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. In determining whether the evidence supports the application of an aggravating circumstance, the proper standard to consider is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999). After a careful review of the testimony and evidence presented at the sentencing hearing, we conclude that the evidence fully supports the findings of the trial court and that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

---

robbery, 8 years for attempted especially aggravated kidnaping, 6 years for aggravated assault, and 3 years for felony escape.

All of the prison terms, except the term imposed for felonious escape, were ordered to run concurrently with each other, but to run consecutively with the sentences then being currently served by the appellant. The prison term for felonious escape was ordered to run consecutively to all of the non-capital offenses. Accordingly, the effective sentence ordered by the court in this case is death and a prison term totaling 23 years, which is to run consecutively to the current prison sentence.

*Tennessee Code Annotated section 39-13-204(i)(3)*

The record shows that the appellant's actions in firing the weapon caused a great risk of death to two or more persons during the act of murder. This factor "'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'" State v. Burns, 979 S.W.2d 276, 280 (Tenn. 1998) (quoting State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984)). This factor "most often has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present." Id.

The record in this case reveals that the appellant threatened the dentist and dental assistant by pointing a loaded weapon at them, that the dentist and the appellant struggled over the loaded weapon, and that when the appellant fired the first shot at the victim, the receptionist was very close nearby. The State also introduced expert testimony that the bullets fired by the appellant could easily have penetrated the thin walls of the office and continued into adjoining rooms. We conclude that a rational trier of fact could have concluded that this aggravated circumstance was proven beyond a reasonable doubt.

*Tennessee Code Annotated section 39-13-204(i)(6)*

The record also demonstrates that the murder was committed to avoid arrest or prosecution. As our cases make clear, the desire to avoid arrest or prosecution need not be the sole motive, so long as it is one of the motives in the killing. State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986); see also State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993) (stating that prevention of arrest and prosecution need not be the "dominant" motive for the killing). The evidence in this case is that the appellant returned to the treatment room after looking for money throughout the office only to put a bullet into the head of an unconscious, non-resisting law-enforcement officer lying face-down on the floor. Viewed in a light most favorable to the State, we conclude that a rational trier of fact could have found the existence of this aggravating circumstance beyond a reasonable doubt.

*Tennessee Code Annotated sections 39-13-204(i)(7), (9)*

Last, the record also shows that the appellant committed the murder while in lawful custody and that the victim was a law-enforcement officer engaged in performing his official duties. In fact, the proof is uncontroverted that the appellant was then currently serving a prison term, and that he was transported to the dentist's office in a marked patrol car by a uniformed police officer in the course of his official duties. The proof is also uncontroverted that the appellant was personally acquainted with Tommy Bishop in Bishop's capacity as a law-enforcement officer and that the appellant knew that Tommy Bishop was acting in his official capacity on the morning of May 2, 1997. Viewed in a light most favorable to the State, we conclude that a rational trier of fact could have found the existence of these two aggravating circumstances beyond a reasonable doubt.

The trial court did not make any specific findings as to which, if any, mitigating circumstances argued by the appellant were proven to exist. For sake of this appeal, and in fairness

to the appellant, we will assume that all five of the mitigating circumstances argued by the appellant were raised by the evidence and are entitled to some consideration. Nevertheless, we agree that the aggravating circumstances far outweigh all of the mitigating circumstances beyond a reasonable doubt.

## COMPARATIVE PROPORTIONALITY REVIEW

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), this Court conducts a comparative proportionality review of every death sentence for the purpose of "determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime." State v. Hall, 8 S.W.3d 593, 604 (Tenn. 1999). This Court applies the precedent-seeking approach, in which we compare a particular case with other cases in which the defendants were convicted of the same or similar crimes. We conduct this comparison by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. See State v. Bland, 958 S.W.2d 651, 664 (Tenn. 1997). Comparative review of capital cases "insures rationality and consistency in the imposition of the death penalty." See id. at 665 (citing State v. Barber, 753 S.W.2d 659, 665-66 (Tenn. 1988); State v. Kandies, 342 N.C. 419, 467 S.E.2d 67, 86 (1996)).

Comparative proportionality review is not required by either the state or federal constitutions, and the review must be distinguished from "traditional Eighth Amendment proportionality analysis, which is the 'abstract evaluation of the appropriateness of a sentence for a particular crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)). In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportionate to the crime of first degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). This purpose of the analysis is to identify arbitrary, or capricious sentences by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)).

A death sentence will be considered disproportionate if the case, taken as a whole, is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Bland, 958 S.W.2d at 665. However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 281 (Tenn. 1998); Bland, 958 S.W.2d at 665 (citing State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986)). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Blanton, 975 S.W.2d at 281; see also Bland, 958 S.W.2d at 665. Instead, our duty "is to assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665. Because "'the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of

arbitrariness or caprice.'" Hall, 958 S.W.2d at 699 (quoting Gregg v. Georgia, 428 U.S. 153, 203 (1976)) (alteration in original).

As we have previously explained in Bland, comparative proportionality review is not a rigid, objective test. See 958 S.W.2d at 668; State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994). We do not employ a mathematical formula or scientific grid, "nor are we bound to consider only those cases in which exactly the same aggravating circumstances have been found by the jury." State v. Cribbs, 967 S.W.2d 773, 790 (Tenn. 1998) (citing State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994)).

Because our comparative proportionality review is based on the precedent-seeking method, our first task is to identify the pool of similar cases, which includes all cases in which the defendant is convicted of first-degree murder and in which a capital sentencing hearing was actually conducted. See Bland, 958 S.W.2d at 666. After identifying a pool of similar cases, "we consider a multitude of variables, some of which were listed in Bland, in light of the experienced judgment and intuition of the members of this Court." See Cribbs, 967 S.W.2d at 790. Selection of similar cases from the general pool is, of course, not an exact science, because no two cases are identical with respect to either circumstances or defendants.

With respect to the circumstances of the offense, the relevant factors considered by this Court include, but are not limited to: (1) the means of death; (2) the manner of death, such as whether the death was violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims.

With respect to comparing the characteristics of the defendants, the following factors were listed in Bland as relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Of course, these factors are not exhaustive, and this Court may consider other factors in comparing the characteristics of the defendant with other defendants in the pool of cases.

Applying these factors, we note that the proof in this case reflects that the victim was senselessly executed by a gunshot wound to the back of his head. It is clear that one motivation for the killing was the facilitation of escape from lawful custody and the avoidance of arrest and prosecution. The victim was a uniformed police officer acting in his official capacity as a transportation officer. The record indicates the presence of premeditation as the appellant returned to the treatment room, after searching the dentist's office for money, to execute the police officer, and because the officer was unarmed and lying face-down on the floor while unconscious, there can be no doubt that the appellant acted totally without provocation or any conceivable justification. In addition, after the deputy was rendered unconscious, he could offer no impediment or further

obstacle of any kind to the appellant's escape plan. During the course of the shooting, the appellant placed in danger the lives of at least four other people.

The appellant, a then 24-year-old African-American male, does have a history of criminal activity, including convictions for aggravated burglary, robbery, forgery, and was then currently serving a sentence for felony escape, assault, and contributing to the delinquency of a minor. Although the defense presented expert proof to establish that the appellant may have been in a dissociative state during the killing, the proof also shows that the appellant does not suffer from any major psychological or psychiatric illness. The appellant did display signs of remorse, but although the appellant's forensic psychologist found his remorse "genuinely sincere," the trial judge made a specific finding that he found the appellant's remorse to be insincere. The appellant, to the extent that it can be considered "cooperation," did plead guilty on the day of trial and waived his right to a sentencing jury. Moreover, notwithstanding any other mitigating evidence presented by the defense at the sentencing hearing, the record does not demonstrate a strong likelihood or potential for rehabilitation.

In State v. Workman, 667 S.W.2d 44 (Tenn. 1984), a jury imposed, and we upheld, a sentence of death for a defendant who shot and killed a police officer following his robbery of a fast-food restaurant. The defendant, who had been apprehended by police officers almost immediately after the robbery, broke free from their lawful custody and fired his pistol at the officers in an attempt to escape. The defendant hit two of the officers and killed one. An examination of Workman reveals that all four of the aggravating circumstances present in that case are also present in this case, including the killing of a police officer, a killing made during his escape from lawful custody, and a killing made "for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Further, the jury found that the defendant's actions in Workman presented a substantial risk of death to two or more persons other than the victim.

In addition, the defendant in Workman, like the appellant in this case, claimed to remember only "'bits and pieces'" of the episode, although the Workman defendant related his memory loss to drug use rather than to a dissociative state. Also like the appellant in this case, the Workman defendant had prior convictions for assault and burglary, although Philip Workman had an additional conviction for selling drugs.

The appellant claims that State v. Workman should not be considered in the proportionality review because there was no significant discussion in that case of the proportionality issue. We disagree. In conducting proportionality review, we have an obligation and a duty to examine all of the cases in the applicable pool irrespective of whether the issue of proportionality was thoroughly discussed in the reported opinion. In fact, when reviewing the cases in which a life sentence was imposed after a hearing, one will not find a written opinion discussing proportionality, and yet, it would be absurd to argue that these cases should not be considered in weighing proportionality. Moreover, "[b]ecause we do not find it necessary in every case to compare in writing, detail by detail, all the specific cases or circumstances which are considered in our proportionality review, it

does *not* follow . . . that we have failed to perform an effective comparative proportionality review as outlined." State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994) (emphasis in original).

Our review also reveals several other cases, though certainly not identical, that contain many circumstances that are similar to the appellant's crime and circumstances. In State v. Taylor, 771 S.W.2d 387 (Tenn. 1989), a 21-year-old defendant was sentenced to death after killing a prison guard while attempting to escape from prison. The record in the Taylor case reveals that the defendant suffered from a history of mental illness, had been incarcerated in a state facility for prisoners with psychiatric problems, and was taking several anti-psychotic drugs, although there was no evidence that the defendant took these drugs on the day of the murder. There was also expert testimony that the defendant committed the murder while in a psychotic episode, although many of the symptoms were also consistent with anti-social personality disorder, a disorder shared by the appellant in this case. A sentence of death was imposed by a jury and upheld by this Court.

In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), the 19-year-old defendant killed two victims after previously shooting each and disabling them. In one case, the defendant shot the victim once, thereby disabling her, and then later returned after searching for valuables in the restaurant to shoot her again in the back of the head while she lay on the floor. Furthermore, the victim in Van Tran did nothing to provoke the attack, and even though she was still conscious, she did not provide any impediment to the defendant's course of action. The Van Tran defendant, unlike the appellant in this case, had no significant history of criminal activity. Nevertheless, a jury imposed the sentence of death, and this Court found the penalty not to be disproportionate.

In State v. Harris, 839 S.W.2d 54 (Tenn. 1992), the defendant received the death penalty for two murders, one of which involved a night security guard for a Gatlinburg hotel. The defendant clubbed the security guard unconscious, dragged him into a motel suite, and later fired a bullet between the guard's eyes while the guard was lying on the floor unconscious. The guard offered no provocation or obstacle to completion of the criminal transaction. This Court affirmed the sentence of death.

In State v. King, 694 S.W.2d 941 (Tenn. 1985), a 32-year-old defendant robbed a tavern while on probation for other offenses. In the course of the robbery, the defendant ordered the tavern owner and three other persons to lie face-down on the floor, and after robbing the victims, the defendant put a bullet through the back of the head of the tavern owner. Again, the tavern owner offered no resistance or obstacle to the completion of the robbery. A jury sentenced the defendant to death, and that sentence was sustained on appeal by this Court. Like the appellant's case, the jury in King found the (i)(3) aggravator of great risk of death to two or more persons other than the victim.

In State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), a second-hand clothing store owner was knocked unconscious with a severe blow to the head and robbed by the defendant. At some point while the victim lay unconscious on the floor, the defendant slit his throat. The jury imposed the death penalty, which was affirmed by this Court.

The appellant relies heavily on the fact that he expressed remorse and "cooperated" with authorities. Ignoring the specific finding of the trial court that the expressions of remorse were insincere, we note that his remorse, even if true, does not render the sentence of death in this case disproportionate. For example, the defendant in Bland also expressed significant remorse. The Bland defendant, moreover, turned himself over to the Memphis Police Department and gave a detailed confession. Even despite the greater cooperative efforts by the defendant in Bland, this Court held that the imposition of the death penalty in that case was not disproportionate or arbitrarily applied. One may likewise look to Van Tran, wherein the defendant expressed remorse for his crime and gave greater cooperative efforts than are present in this case.

The appellant further argues that the death penalty is disproportionate in this case, in part, because he is a youthful offender. Although we are not willing to hold that a 24-year-old defendant is a "youthful" offender for mitigation purposes, our cases reveal that the punishment in this case is certainly not arbitrary or disproportionate because of the appellant's age. See State v. Cauthern, 967 S.W.2d 726 (Tenn. 1998) (upholding a death sentence for a 19-year-old defendant who murdered two victims while burglarizing their home); State v. Bland, 958 S.W.2d 651 (Tenn. 1997) (upholding a death sentence for a 19-year-old defendant who chased, shot, and killed the victim); State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993) (upholding a death sentence for a 19-year-old defendant shot and killed a 74 year-old victim during a robbery); State v. Taylor, 771 S.W.2d 387 (Tenn. 1989) (upholding a death sentence for a 21-year-old defendant assaulted the victim with a knife and the victim died from internal bleeding). While many of these cases also applied the "heinous, atrocious or cruel" aggravator—an aggravator not found in this case—we held that the death sentence in each of these cases was neither arbitrary nor disproportionate, notwithstanding the age of the offenders.

Although the cases in the comparative pool are similar in many aspects to the present case, no case in the pool is exactly the same as the appellant's case. The appellant cites the application of the "heinous, atrocious or cruel" aggravator in many of these other cases as one major example of dissimilarity. While we acknowledge that proportionality review is not an exact science, our function in this regard is not to overturn a death sentence unless we can locate a case that stands on all fours with the case at the bar. Such a task, of course, is both impracticable and impossible because no two such cases exist. As we have stated on multiple occasions, "No two cases are alike, and no two defendants are alike." Harris, 839 S.W.2d at 77.

Instead, our task is to review the circumstances of the present crime and defendant and, when comparing these circumstances with those present in prior cases, we seek to determine whether the present case, taken as a whole, plainly lacks circumstances found in similar cases in which the death penalty has been imposed. See Bland, 958 S.W.2d at 665. In so doing, our role in comparative proportionality review is to identify aberrant death sentences and to prevent the arbitrary application of the death penalty.

In this case, we have tried to identify cases from the comparative pool in which the defendant committed a murder while attempting to escape from lawful custody or in which a law-enforcement officer was murdered while performing his or her official duties. We have also tried to identify cases

-11-

in which the murdered victim was totally helpless, unconscious, or otherwise presented absolutely no impediment to the defendant's desired course of action. Based on our review of these several cases in which the death penalty was upheld, we are unable to say that the appellant's case, taken as a whole, is plainly lacking in circumstances that have previously justified death sentences. Accordingly, we hold that the death sentence imposed in this case was neither disproportionate nor arbitrarily applied.

## CONCLUSION

In conclusion, we have carefully reviewed the record of the sentencing hearing in this case, the briefs and arguments of the parties, and the applicable legal authority. Based on this extensive review, we hold that the sentence of death in this case is not disproportionate or arbitrarily applied given the nature of the crime and the circumstances of the appellant. We further hold that the evidence presented establishes, in a light most favorable to the State, the presence of each aggravated circumstance beyond a reasonable doubt, and that the aggravated circumstances outweigh any mitigating circumstances beyond a reasonable doubt. The judgment of the Court of Criminal Appeals, which sustained the death sentence imposed by the Fayette County Circuit Court, is affirmed.

It appearing from the record that the appellant is indigent, costs of this appeal are assessed to the State of Tennessee.