# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 10, 2004 Session

## STATE OF TENNESSEE v. ANDREW THOMAS, ET AL.

**Direct Appeal from the Court of Criminal Appeals**
**Circuit Court for Shelby County**
**No. 00-03095      Joseph B. Dailey, Judge**

---

### No. W2001-02701-SC-DDT-DD

---

The defendant, Andrew Thomas, was convicted of felony murder.  In imposing a death sentence, the jury found that evidence of one aggravating circumstance, i.e., the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, outweighed the evidence of mitigating circumstances beyond a reasonable doubt.  The Court of Criminal Appeals affirmed the conviction and the death sentence, and the case was automatically docketed in this Court.  We entered an order identifying three issues for oral argument and now hold as follows:  (1) the trial court did not err in excusing a prospective juror for cause; (2) the trial court erred in refusing to instruct the jury on lesser included offenses of felony murder but the error was harmless beyond a reasonable doubt; and (3) the death sentence was not arbitrary, excessive, or disproportionate.  We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined.  ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

Michael E. Scholl and Robert C. Brooks, Memphis, Tennessee, for the Appellant, Andrew Thomas.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Jennifer Nichols, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The defendant, Andrew Thomas, and his co-defendant, Anthony Bond, were indicted for the felony murder of the victim, James Day. The following evidence was presented at the joint trial of the defendant and Bond.[1]

**Guilt Phase**

Shortly after 12:30 p.m. on April 21, 1997, the defendant and his co-defendant, Bond, saw an armored truck guard with a money deposit bag leaving a Walgreens drug store on Summer Avenue in Memphis, Tennessee. The defendant ran up, shot the guard in the back of the head, grabbed the deposit bag, and jumped into a white car being driven by Bond. The defendant and Bond abandoned the white car on a street behind Walgreens, got into a red car that the defendant had borrowed from his girlfriend, and drove away.

Betty Gay, a Walgreens' employee, heard the gunshot and then saw the armored truck guard, James Day, lying in the parking lot. She saw a man running from the scene with a gun and the deposit bag.[2] Charles Young, the assistant manager of Walgreens, ran outside and saw Day lying face down in a pool of blood. Day, who was conscious, told Young, "Call my wife." Day remained conscious and continued to talk until an ambulance arrived.

Several witnesses described the cars used by the defendant and Bond and gave descriptions of the occupants to the police. One witness, Richard Fisher, testified that he saw a white car "speed" around the armored truck in the front of the store and that the car was within four feet of him. Fisher later identified the defendant as the passenger in the white car.

Later on the afternoon of April 21st, the defendant and Bond arrived at the apartment of Angela Jackson, who was then the defendant's girlfriend. According to Jackson, the two men were "excited" and "out of breath." After telling Bond to get rid of the gun, the defendant began taking money, checks, and food stamps from small white envelopes that had been in Bond's jacket. The defendant and Bond divided the money.

Jackson testified that later that same day, the defendant bought a customized car with gold plates and spoke wheels for $3,975 in cash. The car was titled in Jackson's name. Afterward, the defendant told Jackson that they needed to get a hotel room. While watching a news report that evening at the hotel about the shooting, the defendant told Jackson that the victim "did not struggle for his life" and that he had "grabbed the nigger by the throat and shot him."

---

[1] Bond was convicted of felony murder and sentenced to life imprisonment; however, his conviction was reversed by the Court of Criminal Appeals based on the trial court's failure to charge the jury on the lesser included offense of facilitation of felony murder. The State's application for permission to appeal was denied on August 30, 2004. Accordingly, Bond's appeal is not before this Court.

[2] Gay testified that the deposit bag contained $18,843.01 in cash, checks, and food stamps.

On the day after the shooting, Jackson opened a bank account in her name and deposited $2,401.48 in cash. Two days later, she bought a shotgun because the defendant said they needed it "for protection." According to Jackson, the defendant later bought a gold necklace for himself and wedding rings for both of them. After getting married in May, the couple separated two months later. The defendant told Jackson not to tell police about the robbery.

The victim, James Day, did not immediately die from the gunshot wound to the back of his head. Instead, the gunshot damaged his spinal cord and resulted in paraparesis (a profound weakness in one's abdomen and legs) and neurogenic bladder (a loss of bladder and bowel control due to nerve damage). Faye Day Cain, the victim's widow, testified that her husband underwent numerous surgeries, needed constant care and medical attention, and was unable to work. He was confined to one room, was unable to use the bathroom, and became depressed. In late September of 1999, Day was rushed to the hospital for emergency surgery after his bladder ruptured. The condition caused an infection; Day's condition continued to worsen, and he finally died on October 2, 1999.

The medical examiner for Shelby County, Tennessee, Dr. O. C. Smith, testified that the cause of Day's death was sepsis, "secondary to the rupture of his bladder resulting from spinal cord injury caused by the gunshot wound to his head." Dr. Smith considered Day's death a homicide, and he stated that the "infection from the ruptured bladder" could be "directly related back to [the] gunshot wound." Dr. Smith conceded that Day suffered from heart disease, high blood pressure, diabetes, and obesity, but he stated that these conditions did not cause the death. Dr. Smith's assistant, Dr. Cynthia Gardner, likewise testified that Day's death resulted from the injuries caused by the gunshot wound.

A videotape of the shooting captured by Walgreens' surveillance cameras was played for the jury. A videotape made from the original was also played for the jury at a slower speed. Angela Jackson identified the defendant as the gunman who shot the guard in the back of the head from a still photograph that had been made from the videotape.

After considering the evidence, the jury convicted the defendant of felony murder based on the killing of the victim "during an attempt to perpetrate robbery as charged in the indictment." The trial court then held a sentencing hearing for the jury to determine the punishment.

**Penalty Phase**

To support the prior violent felony aggravating circumstance, the prosecution introduced evidence that the defendant had prior convictions for felony offenses whose statutory elements involved the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2) (2003). The proof showed that in September of 1994, the defendant was convicted of seven counts of aggravated robbery and one count of robbery. In January of 1994, the defendant was convicted of one count of aggravated robbery.

The indictments underlying the defendant's prior convictions for aggravated robbery revealed that the offenses involved the defendant's use of a firearm and involved different victims. On January 4, 1993, he used a firearm in taking between $1,000 and $10,000 from Michael Osborne. On February 1, 1993, he used a firearm in taking between $1,000 and $10,000 from Booker Sanders, and he used a handgun in taking money and food stamps totaling $1,000 to $10,000 from Lee Harris. On March 8, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Amos Kirby. On March 12, 1993, he used a firearm in taking checks valued under $500 from Carl Hutchinson. On March 15, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Onie Massey, and he used a firearm in taking between $500 and $1,000 from Dewayne McCoy. On June 25, 1993, he used a pistol in taking jewelry valued at $1,000 to $10,000 from Gary Smallwood.

The prosecution also introduced the testimony of Faye Day Cain, the widow of the victim, James Day. She testified that her husband had worked two jobs to support his family before he was shot and that she was unable to work due to a medical condition known as thrombophlebitis. She testified that since her husband's death, she and the couple's minor son lived on disability payments and social security benefits. Ms. Cain testified that the victim had been her husband, confidant, lover, and best friend. After the shooting, however, she and her husband could no longer have physical contact or intimacy. The victim "couldn't stand to be touched" and "the least little noise would turn him into a frenzy." She testified that she had suffered great emotional pain, that she was no longer a happy person, and that she cried often.

According to Ms. Cain, the couple's son, Cedric, was twelve when his father was shot. They had enjoyed riding motorcycles, having breakfast, and doing "father and son" things. After the shooting, however, Cedric became "hurt and angry."

After the prosecution rested, the defendant presented evidence of mitigating circumstances. The defendant's mother, Luella Barber, testified that the defendant was born in February of 1973. She said the defendant's father, Andrew Thomas, Sr., did not visit the family regularly; he abused drugs, abused her in the defendant's presence, and was often in jail. Ms. Barber divorced Andrew Thomas, Sr., in 1977, and she later married William Barber. She said that the defendant's stepfather, Barber, also abused her in front of the children and became involved with drugs.

According to Ms. Barber, the defendant started getting into trouble for stealing when he was fourteen. Although the defendant dropped out of school, he received his GED and a certificate as a residential plumber's helper while in jail. Ms. Barber said that she loved her son and that her life would not be the same without him.

Several other family members also testified on behalf of the defendant. Alacia Bolden, the mother of the defendant's eight-year-old son, testified that their son loved his father and continued to have a close relationship with him. Andre Barber, the defendant's brother, testified that he had always looked up to the defendant, that they had a close relationship, and that they talked often. He said that losing the defendant would "devastate" their mother. Similarly, Stephanie Williams and

Tamara Weeks, the defendant's cousins, testified that they had close relationships with the defendant. Williams said that she did not want to see the defendant die, and Weeks believed that the defendant was an important male figure in his son's life despite his incarceration.

The jury imposed the death penalty after finding that the evidence supporting the sole aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt. On appeal, the Court of Criminal Appeals affirmed the conviction and the death sentence after concluding that twenty-two issues raised by the defendant were without merit.

## ANALYSIS

### Excused Prospective Juror

We first review the defendant's argument that the trial court erred in excusing a prospective juror, Gary Pannell, based on his views regarding the death penalty. The State maintains that the trial court properly excused Pannell based on his statements and views about imposing a death sentence.

To place this issue into context, we will include the portions of the voir dire with respect to this prospective juror. First, the exchange between the assistant district attorney general and the prospective juror:

> Q. Mr. Pannell, same question to you, if the State of Tennessee proves the aggravating circumstances, beyond a reasonable doubt, and proves that they weigh more than the mitigators, again, beyond a reasonable doubt, can you sentence one or both of the defendants to death?
>
> A. I really don't think so.
>
>     . . . .
>
> A. I had a hard time dealing with it last night, soul searching and everything.
>
> Q. All right.
>
> A. And there have been articles in the paper recently about planted evidence and stuff like that, that it makes it hard for me to say that I would agree to a death sentence on something I didn't witness myself.
>
> Q. That's fine.

A. Or to hear the person charged with the crime to personally admit to it himself.

Q. All right. So you couldn't follow the law in the State of Tennessee if what I have told you would be the law that you would have to follow according to [Judge] Dailey's instructions?

A. Well, you know you have to listen to witnesses.

Q. Yes, sir.

A. Okay. And that's where I would have a problem, is taking what they are saying, and saying, "Okay, what they are saying is true," which I don't know –

Q. All right.

A. And to me, death is – it's a permanent thing.

Q. Yes, sir. Thank you.

A. You don't come back with it.

Q. Thank you.

After the prosecution moved to excuse the prospective juror for cause, counsel for the defendant asked the following questions:

Q. Sir, let me ask you this: Are there circumstances where you feel you could give the death penalty? You mentioned you wouldn't feel comfortable doing it unless you actually saw it or unless you heard someone admit to it. Are there circumstances where you could give that punishment?

A. That's the only two that I can thin[k] of right now.

Q. So there are some circumstances where you could give that punishment if it actually showed; is that correct?

A. That's right.

Q. I have no further questions, Your Honor.

Finally, the trial court had the following exchange with the prospective juror:

Q.    So you're not foreclosing the possibility of giving the death penalty. Is that correct, Mr. Pannell?

A.    That's correct.

Q.    You're just stating that you would have to see sufficient proof to satisfy you that the aggravating circumstances outweigh the mitigating circumstances.

A.    Sufficient proof in my eyes would be what I witnessed myself or what the person charged with the crime – if they said that they did it, yes, I could go along with it.

Q.    Let me ask you this: If you felt that the state had proven the aggravating circumstance that they allege – you're satisfied that they have proven that and that it outweighed the mitigation – the mitigating circumstances – but neither of these criteria that you set forth existed, are you saying, then, that even though you felt that the state had proven their aggravating circumstances, you still could not follow the law and impose the death penalty?

A.    (No audible response)

Q.    Do you follow what I'm saying?

A.    (No audible response)

Q.    You set up two criteria that you say are the only two by which you could consider voting for the death penalty, and I'm saying what happens if, in your mind, if you determine that the state has proven, beyond a reasonable doubt, the existence of the aggravating circumstance they allege, and you further find, in your mind, that that aggravating circumstance does, indeed, outweigh, beyond a reasonable doubt, any mitigating circumstances that have been presented – if you find that the law had been satisfied in that regard as it's set up by the legislature, but you find that these two circumstances that you set forth aren't part of this process – don't exist in this process, are you saying that because of that, you could not go forward an[d] impose the death penalty?

-7-

A.     I would have a hard time taking what I would hear coming from witnesses' accounts and everything because, just like I said, just last week in the paper about some incidents down in Florida –

Q.     Well, we wouldn't want to get into what was in the paper because we don't try cases in the paper or on TV.

A.     Okay.  It's planted evidence –

Q.     Well –

A.      – people can say anything –

Q.     Okay.  Thank you, Mr. Pannell . . . .


After the State renewed its challenge to the prospective juror for cause, the trial court heard arguments from the parties.  The trial court then excused the prospective juror for cause after concluding:

I think that his responses, in their totality – he, at best, has given some sort of qualified statement that he could, under his own perceived limited circumstances follow the law; and under the law, that's not good enough.  He conceded that if the state proved what they were required to prove under the statute but it didn't meet his self-appointed criteria, then he couldn't go forward and follow the law.  And I don't think that's what our system requires of a juror.  And I – that's just the way he feels, and that's fine; but I'll note your exception.  I'm going to go ahead and excuse him.

The principles governing a trial court's decision to excuse a prospective juror challenged for cause are set out as follows.  Under Wainwright v. Witt, 469 U.S. 412, 424 (1985), prospective jurors may be excused for cause only if their views about the death penalty would "prevent or substantially impair" the performance of their duties as a juror in accordance with their instructions and their oath.  See also State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994).  However, a juror's bias need not be proven with "unmistakable clarity" to justify a challenge for cause.  Id.

A trial court must have the "definite impression that a prospective juror could not follow the law."  Hutchison, 898 S.W.2d at 167; see Wainwright, 469 U.S. at 425-26.  A trial court's findings "are accorded a presumption of correctness, and the [defendant] must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn

that decision." State v. Austin, 87 S.W.3d 447, 473 (Tenn. 2002); see also State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989); State v. Duncan, 698 S.W.2d 63, 71 (Tenn. 1985).

A review of these principles as applied illustrates the broad discretion afforded to the trial court. In Wainwright, for instance, the Supreme Court concluded that a prospective juror was properly excused where she was "afraid" or "thought" that her views against the death penalty may interfere with her ability to determine the defendant's guilt. 469 U.S. at 426. In Austin, this Court agreed that the trial court had properly excused several prospective jurors who indicated that they would not consider or did not "believe" in imposing the death penalty. 87 S.W.3d at 473. In Duncan, a case very similar to the present case, this Court held that a prospective juror was properly excused where she believed that she could not impose the death penalty "unless she saw the crime committed," and where she stated that she did not want to "judge another human being on the basis of what one says against what another person says." 698 S.W.2d at 71; see also Alley, 776 S.W.2d at 517-18 (prospective juror excused where he was "not sure" he could consider the death penalty).

In our view, the defendant has not met the burden of establishing by convincing evidence that the trial court erred in excusing prospective juror Pannell for cause. The prosecutor extensively questioned Pannell as to whether he could apply the law to the evidence and consider all forms of punishment in this case. Pannell consistently indicated that it would be "hard for [him] to say" that he would impose the death penalty for a crime he did not witness or for a crime to which the defendant had not confessed. Cf. Duncan, 698 S.W.2d at 71. In response to additional questioning by defense counsel, Pannell reiterated that he could impose the death penalty only in those circumstances where he had witnessed the crime or heard a defendant's confession. Finally, Pannell answered the trial court's questions by saying that he could not follow the law as to aggravating and mitigating circumstances unless his own criteria were satisfied.

In sum, the prospective juror was questioned extensively by both parties and the trial court. The trial court gave defense counsel ample opportunity to rehabilitate the prospective juror and gave full consideration to the arguments of the parties. The trial court asked its own questions to further explore the prospective juror's views. Accordingly, we conclude that the trial court did not err in excusing prospective juror Pannell.

### Lesser Included Offenses

We next address the defendant's argument that the trial court committed reversible error in failing to instruct the jury on the lesser included offenses of felony murder, i.e., second degree murder, reckless homicide, and criminally negligent homicide.[3] The State concedes that the trial

---

[3] Felony murder requires, in relevant part, evidence of "a killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Tenn. Code Ann. § 39-13-202 (a)(2) (2003). Second degree murder requires evidence of "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (2003). Reckless homicide requires evidence of "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (2003). Criminally negligent homicide requires evidence that criminally negligent conduct "results in death." Tenn. Code Ann. § 39-13-212(a) (2003).

court erred in failing to instruct the jury on these lesser included offenses, but it asserts that the trial court's error was harmless beyond a reasonable doubt.[4]

An instruction on a lesser included offense must be given if the trial court, viewing the evidence most favorably to the existence of the lesser included offense, concludes (a) that "evidence exists that reasonable minds could accept as to the lesser included offense," and (b) that the evidence "is legally sufficient to support a conviction for the lesser-included offense." State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999). The failure to instruct the jury on lesser included offenses requires a reversal for a new trial unless a reviewing court determines that the error was harmless beyond a reasonable doubt. State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). In making this determination, the reviewing court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

This Court has previously held that second degree murder, reckless homicide, and criminally negligent homicide are lesser included offenses of felony murder. Ely, 48 S.W.3d at 721. We explained:

> After comparing the respective elements of felony murder, second degree murder, reckless homicide, and criminally negligent homicide, it appears that the elements of the lesser offenses are a subset of the elements of the greater and otherwise differ only in the mental state required. We hold that because the mental states required for the lesser offenses differ only in the level of culpability attached to each in terms of seriousness and punishment, the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the Burns test.

Id. at 721-22.

We conclude, and the State concedes, that the record in this case demonstrates that the trial court erred in failing to instruct the jury on second degree murder, reckless homicide, and criminally negligent homicide. There was evidence that reasonable minds could accept as to these lesser included offenses, and the evidence was legally sufficient to support a guilty verdict on these lesser included offenses. See id. at 724-25 (holding that the trial court erred in failing to instruct on the lesser included offenses to felony murder); see also Burns, 6 S.W.3d at 467.

---

[4] The State asserts that the trial court did not err in failing to instruct the jury on the offense of facilitation of felony murder because there was no evidence to support such an instruction. See State v. Ely, 48 S.W.3d 710, 724 (Tenn. 2001) (evidence did not warrant an instruction on the lesser included offense of facilitation). The defendant in this case has not raised an issue as to facilitation as a lesser included offense in his brief.

We further conclude, however, that the trial court's failure to instruct on these lesser included offenses was harmless beyond a reasonable doubt. The evidence at trial revealed that the defendant shot the victim, an armored truck guard, in the back of the head and stole the victim's Walgreens money deposit bag. The defendant was identified as one of two men fleeing from the scene in a white car. The defendant's criminal conduct was filmed by a surveillance camera, and the videotape of the crime was played for the jury. The defendant's ex-wife, Angela Jackson, identified the defendant from a still photograph made from the videotape. The defendant later divided the contents of the money deposit bag with his co-defendant, Anthony Bond, and he told Jackson that he had shot the guard. The testimony established that the victim suffered extensive injuries and later died as a result of these injuries. In sum, the evidence overwhelmingly established the elements of felony murder, i.e., the defendant's killing of another in the perpetration of a robbery. See Tenn. Code Ann. § 39-13-202(b) (2003).

Moreover, the defendant's theory of defense was two-fold: (1) that he was not involved in the robbery, and (2) that the gunshot wound did not cause the victim's death. See Allen, 69 S.W.3d at 191 (reviewing court should analyze the defendant's theory of defense). The defendant did not concede that he was involved in the crime, and he did not argue that he was guilty of a lesser included offense or attempt to establish that he was guilty of a lesser included offense. Compare id. at 191-92 (theory of defense, in part, was that the defendant lacked the required mental state for the offense). In sum, we agree with the Court of Criminal Appeals' conclusion that the jury could not reasonably have concluded that the defendant was guilty of anything other than a killing in the perpetration of a robbery, i.e., felony murder.

Accordingly, we hold that the trial court erred in failing to instruct the jury on the lesser included offenses of felony murder but that the error was harmless beyond a reasonable doubt.

## Proportionality

Where a defendant has been sentenced to death, we must apply a comparative proportionality analysis pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D) (2003). The analysis is intended to identify aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "'disproportionate to the punishment imposed on others convicted of the same crime.'" State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)).

In conducting this analysis, this Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 665-67. While no defendants or crimes are alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

We have repeatedly held that the pool of cases considered by this Court in its proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital

-11-

sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). We have explained that the pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. We previously have declined to review the exercise of prosecutorial discretion, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases.

Id. at 784 (citations omitted).

Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. Bland, 958 S.W.2d at 667. We also consider numerous factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id.; see also State v. Bane, 57 S.W.3d 411, 428-29 (Tenn. 2001).

In this case, the evidence showed that the defendant shot the victim in the back of his head and stole the victim's Walgreens money deposit bag. The defendant was identified as one of two men fleeing from the scene, and the shooting was filmed by a surveillance camera and shown to the jury. Angela Jackson identified the defendant as the shooter from a still photograph made from the videotape. The defendant later divided the contents of the deposit bag with his co-defendant, and he told Jackson that he killed the guard. The evidence established that the victim suffered extensive injuries and suffered extreme pain and disability from these injuries for over two years before his death.

The evidence also showed that the defendant was twenty-four years old at the time of this offense. He had eight prior convictions for aggravated robbery and a conviction for robbery. As discussed above, the prior aggravated robbery offenses took place from January to June of 1993 and involved the defendant's use of a firearm and several different victims. On January 4, 1993, for instance, the defendant used a firearm in taking between $1,000 and $10,000 from Michael Osborne. On February 1, 1993, he used a firearm in taking between $1,000 and $10,000 from Booker Sanders,

and he used a handgun in taking money and food stamps totaling $1,000 to $10,000 from Lee Harris. On March 8, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Amos Kirby. On March 12, 1993, he used a firearm in taking checks valued under $500 from Carl Hutchinson. On March 15, 1993, he used a firearm in taking money and checks totaling $500 to $1,000 from Onie Massey, and he used a firearm in taking $500 to $1,000 from Dewayne McCoy. Finally, on June 25, 1993, he used a pistol in taking jewelry valued at $1,000 to $10,000 from Gary Smallwood.

The defendant played the major role in the present case by shooting the victim and stealing the victim's deposit bag. The defendant told the co-defendant to get rid of the gun he had used to shoot the victim. The defendant showed absolutely no remorse for the offense; indeed, he divided the money with his co-defendant and immediately went on a shopping spree, buying a car, jewelry, and wedding rings. He told Angela Jackson that "the victim did not struggle for his life" and that "he grabbed the nigger by the throat and shot him."

The defendant offered mitigating evidence regarding his family background from his mother, brother, and cousins. The defendant rarely saw his father as a child, and his father had been involved in drugs. The defendant's father and his stepfather abused the defendant's mother. The evidence showed that the defendant had the support of his family members, including his minor son, and that he had earlier earned his GED while in prison. There was no evidence, however, that the defendant had any physical, mental, or emotional difficulties that impaired his judgment or mitigated the offense he committed in any other way.

After reviewing the record, we conclude that the evidence in this case clearly supported the jury's finding that the aggravating circumstance, i.e., that the defendant had prior convictions for felonies whose elements involved violence to the person, was proven beyond a reasonable doubt. Similarly, the evidence supported the jury's finding that the evidence of this aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(B) (2003).

We also conclude that the death sentence as applied to the defendant in this case was not arbitrary, excessive or disproportionate when compared to defendants in other cases. See Tenn. Code Ann. § 39-13-206(c)(1)(A), (C), and (D) (2003).

This Court has upheld the death sentence in similar cases where the defendant shot a victim at close range. See State v. McKinney, 74 S.W.3d 291, 312 (Tenn. 2002); State v. Henderson, 24 S.W.3d 307, 310 (Tenn. 2000); State v. Cribbs, 967 S.W.2d 773, 777 (Tenn. 1998). Similarly, this Court has upheld the death penalty in numerous cases in which the victim was shot in the course of a robbery or other felony offense. In State v. Reid, 91 S.W.3d 247, 260 (Tenn. 2002), for instance, the defendant received the death penalty for shooting two victims in the course of a robbery. In State v. Stout, 46 S.W.3d 689, 693-94 (Tenn. 2001), the defendant was sentenced to death for kidnapping the victim and shooting her in the head. Similarly, in State v. Sims, 45 S.W.3d 1, 5-6 (Tenn. 2001), the defendant was sentenced to death for shooting the victim in the course of a burglary. See also

State v. Smith, 993 S.W.2d 6, 18 (Tenn. 1999) (victim shot during robbery); State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993) (victim shot in the head during robbery); State v. Boyd, 797 S.W.2d 589, 595 (Tenn. 1990) (victim shot during robbery).

In addition, this Court has upheld numerous death sentences in cases involving a defendant with previous convictions for felonies whose statutory elements involved the use of violence to the person, i.e., the aggravating circumstance in this case. See, e.g., Reid, 91 S.W.3d at 287; McKinney, 74 S.W.3d at 312; Stout, 46 S.W.3d at 694; Sims, 45 S.W.3d at 19-20; State v. Bates, 804 S.W.2d 868, 882-83 (Tenn. 1991). As this Court has said, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[]" aggravating circumstances. Howell, 868 S.W.2d at 261. Indeed, we have upheld the death sentence in cases in which this was the sole aggravating circumstance found by the jury. See McKinney, 74 S.W.3d at 312; State v. Chalmers, 28 S.W.3d 913, 919 (Tenn. 2000); State v. Keough, 18 S.W.3d 175, 184 (Tenn. 2000).

Finally, we note that numerous death penalty cases involved defendants who presented evidence of mitigating circumstances substantially similar to that presented by the defendant in this case. For example, several cases have involved defendants who were a similar age as the defendant. See State v. Davis, 141 S.W.3d 600, 621 (Tenn. 2004); State v. Pike, 978 S.W.2d 904, 922 (Tenn. 1998); Bland, 958 S.W.2d at 674. Likewise, numerous defendants have presented mitigating evidence of their backgrounds, poor childhood environments, parents who used drugs, and similar circumstances. Davis, 141 S.W.3d at 621; Stout, 46 S.W.3d at 708; Henderson, 24 S.W.3d at 318; Bland, 958 S.W.2d at 670.

Our task does not require a finding that this case is exactly like a prior case in every respect, nor does it require a determination that this case is "more or less" like other similar death penalty cases. See McKinney, 74 S.W.3d at 313. Instead, we must identify aberrant death sentences by determining whether a case plainly lacks circumstances similar to those cases in the relevant pool of cases in which a death sentence has been upheld. Id. Accordingly, the death sentence in this case is not arbitrary, excessive, or disproportionate.

## CONCLUSION

After reviewing the entire record and applicable authority, we hold: (1) the trial court did not err in excusing a prospective juror for cause; (2) the trial court erred in refusing to instruct the jury on lesser included offenses of felony murder, but the error was harmless beyond a reasonable doubt; and (3) the death sentence was not arbitrary, excessive, or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

The defendant's sentence of death shall be carried out on the 10th day of August, 2005, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

-14-

_____

E. RILEY ANDERSON, JUSTICE