IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 7, 2023 Session

**KENNATH ARTEZ HENDERSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Fayette County**
**No. 4465      J. Weber McCraw, Judge**

_____

**No. W2023-00515-CCA-R3-ECN**

_____

The Petitioner, Kennath Artez Henderson, appeals the Fayette County Circuit Court's summary denial of his petition for a writ of error coram nobis, challenging the sentence of death that the trial court imposed after his guilty plea to the first degree premeditated murder of a law enforcement officer.  On appeal, the Petitioner claims that newly discovered evidence of severe brain damage and serious mental illness at the time of the offense may have resulted in a different judgment if presented at trial, that he was without fault in failing to present the evidence at the proper time because trial counsel were ineffective for failing to discover and present the evidence at sentencing, and that due process requires tolling the statute of limitations.  Based on our review of the oral arguments, the record, and the parties' briefs, we affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JILL BARTEE AYERS, J., joined.

Kelley J. Henry, Chief, and Amy D. Harwell, Assistant Chief, Capital Habeas Unit, Federal Public Defender, and Katherine M. Dix, Assistant Federal Public Defender, Nashville, Tennessee, for the appellant, Kennath Artez Henderson.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; James Gaylord, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Falen M. Chandler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## FACTS

On May 13, 1997, the Fayette County Grand Jury returned a ten-count indictment, charging the Petitioner with one count of first degree premeditated murder, three counts of first degree felony murder, two counts of especially aggravated kidnaping, and one count each of attempted especially aggravated kidnaping, aggravated robbery, aggravated assault, and felony escape. On July 6, 1998, the day trial was scheduled to begin, the Petitioner pled guilty to all of the charges except the charges for the three counts of first degree felony murder. Our supreme court summarized the facts in its opinion from the Petitioner's direct appeal of his convictions as follows:

At the time of the events giving rise to this case, the [Petitioner] was incarcerated at the Fayette County Jail serving consecutive sentences for felony escape and aggravated burglary. On April 26, 1997, as the [Petitioner] was planning an escape from jail, he had a .380 semi-automatic pistol smuggled into the jail through his girlfriend. A couple of days later, the [Petitioner] requested dental work on a tooth that needed to be pulled, and an appointment was made for May 2 with Dr. John Cima, a dentist practicing in Somerville. Dr. Cima had practiced dentistry in Somerville for more than thirty years, and he had often seen inmate patients. In fact, this was not the [Petitioner's] first visit to see Dr. Cima.

On May 2, 1997, Deputy Tommy Bishop, who was serving in his official capacity as a transport officer for the Fayette County Sheriff's office, took the [Petitioner] and another inmate, Ms. Deloice Guy, to Dr. Cima's Office in a marked police car. Upon their arrival at the dentist's office, Dr. Cima placed the [Petitioner] and Ms. Guy in separate treatment rooms, and each patient was numbed for tooth extraction. Deputy Bishop remained in the reception area and talked with the receptionist during this time.

When Dr. Cima and his assistant returned to the [Petitioner's] treating room to begin the tooth extraction, the [Petitioner] pulled out his .380 pistol. Dr. Cima immediately reached for the pistol, and he and the [Petitioner] struggled over the weapon. During this brief struggle, Dr. Cima called out for Deputy Bishop, and the deputy hurried back to the treatment room. Just as the deputy arrived at the door, the [Petitioner] regained control of the pistol and fired a shot at Deputy Bishop, which grazed him on the neck. Although not fatal, this shot caused the deputy to fall backwards, hit his head against the doorframe or the wall, and then fall to the floor face down, presumably unconscious.

The [Petitioner] then left the treating room and came back with the receptionist in his custody. The [Petitioner] reached down and took Deputy Bishop's pistol, and he took money, credit cards, and truck keys from Dr. Cima. The [Petitioner] then ordered Dr. Cima and the receptionist to accompany him out of the building, but just before he turned to leave the building, the [Petitioner] went back to the treatment room, leaned over Deputy Bishop, and shot him through the back of the head at point-blank range. The deputy had not moved since first being shot in the neck moments earlier and was still lying face-down on the floor by the door to the treatment room when the [Petitioner] fatally shot him.

Once outside of the office, the [Petitioner] was startled by another patient, and Dr. Cima and his receptionist were able to escape back into the office. Once inside, Dr. Cima locked the door and called the police. The [Petitioner], in the meantime, stole Dr. Cima's truck and drove away at a slow speed so as not to attract any attention to himself. When police officers began to follow him, the [Petitioner] sped away, and eventually drove off the road and into a ditch. The officers took the [Petitioner] into custody, and upon searching the truck, they found the murder weapon, Deputy Bishop's gun, and personal items taken from Dr. Cima's office.

*State v. Henderson*, 24 S.W.3d 307, 310-11 (Tenn. 2000) (footnotes omitted).

One week after the Petitioner's guilty pleas, he waived his right to have a jury empaneled to determine his sentence, and the trial court held a sentencing hearing. *Id*. at 311. Four witnesses, including the Petitioner, testified in mitigation at the hearing. *Henderson v. State*, No. W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *41 (Tenn. Crim. App. June 28, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005).

A brief review of the relevant testimony is in order. The Petitioner testified that he was twenty-four years old at the time of the crimes. *Henderson*, 24 S.W.3d at 311. He was heavily involved in extracurricular activities and sports in high school but had "some 'problems'" that were never addressed. *Id*. While the Petitioner was in jail in 1996, he requested counseling because he thought he "'needed help psychologically.'" *Id*. The Petitioner's mother testified that she did not think the Petitioner needed any help or intervention in his high school years and that she did not pursue obtaining help for him in jail because he "'seemed to be doing fine when [she] talked to him.'" *Id*. at 311-12. Dr. Lynne Zager, a forensic psychologist who evaluated the Petitioner for the sentencing hearing, testified about her findings and conclusions, which were based on two interviews with him, a personality test she administered, and information supplied by the defense. *Id*. at 312. She concluded that the Petitioner was suffering from dissociative disorder at the

time of the crimes and that he "possessed an unspecified personality disorder which exhibited some narcissistic and anti-social traits." *Id*. She thought his dissociative state began after he fired the first shot and lasted at least twenty-four hours. *Id*. She opined that he was "'[acting] under duress, and that his judgment was not adequate'" at the time of the crimes but that his "condition at the time of the murder would not support a legal finding of insanity." *Id*.

At the conclusion of the sentencing hearing, the trial court found that all four aggravating circumstances argued by the State had been proven beyond a reasonable doubt:

> (1) that the defendant created a great risk of death to two or more persons during the act of murder; (2) that the murder was committed for the purpose of avoiding an arrest; (3) that the murder was committed during the defendant's escape from lawful custody; and (4) that the murder was committed against a law enforcement officer, who was engaged in the performance of official duties.

*Id*. at 312 (citing Tenn. Code Ann. § 39-13-204(i)(3), (6), (7), (9)). The trial court imposed a sentence of death for Deputy Bishop's murder and a consecutive effective sentence of twenty-three years for the remaining convictions. *Id*. fn.4.

On direct appeal of his convictions to this court, the Petitioner argued only that his death sentence was disproportionate to the penalty imposed in similar cases. *State v. Henderson*, No. 02C01-9808-CC-00243, 1999 WL 410421, at *3 (Tenn. Crim. App. June 15, 1999). This court affirmed the judgments of the trial court. *Id*. at *5. On automatic direct appeal to our supreme court, that court held that the Petitioner's sentence of death was not disproportionate or arbitrarily applied, that the evidence supported each of the four aggravating circumstances beyond a reasonable doubt, and that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. *Henderson*, 24 S.W.3d at 319.

The Petitioner filed a timely petition for post-conviction relief on February 12, 2001, and an amended petition on November 30, 2001, claiming, in pertinent part, that trial counsel were ineffective for failing to consult with him, which prevented them from monitoring his mental health, and for failing to develop and introduce mitigation evidence. *Henderson*, 2005 WL 1541855, at *1, *40. Regarding the latter argument, the Petitioner claimed "significant" mitigation evidence of his mental health existed, specifically, that his extended family members had a history of mental illness and that he suffered from Bipolar Type 2 disorder at the time of Deputy Bishop's death, none of which trial counsel investigated or presented at sentencing. *Id*. at *40.

At the 2003 post-conviction evidentiary hearing, second-chair trial counsel testified that he was appointed to represent the Petitioner in June 1997, that he met with the Petitioner's family members three or four times, and that he met with the Petitioner "numerous" times before trial. *Id*. at *5. He described the Petitioner as "'calm,'" "'respectful,'" and "'pleasant'" and said that the Petitioner's mother never indicated he had any mental health issues or was mentally deficient. *Id*. at *7. Second-chair counsel "was not able to discern any obvious indicators that the [P]etitioner was unable to assist in his representation or suffered from any mental illness," and "[a]ny information related to possible mental illnesses or deficiencies were solely limited to the opinions of Dr. Zager." *Id*. Evidence of the Petitioner's guilt was overwhelming, but evidence of mental illness in the Petitioner's family would have been relevant to the defense and the trial court. *Id*.

Lead trial counsel testified that he met with the Petitioner before the Petitioner's transfer to Riverbend Maximum Security Institution and that he met with the Petitioner three or four times at Riverbend. *Id*. at *8. Lead counsel hired experts and investigators, and he provided everything in the Petitioner's file to Dr. Zager. *Id*. at *9. Lead counsel saw nothing to indicate that insanity would be a viable offense, and the Petitioner was not lacking in mental capacity. *Id*. Lead counsel described the Petitioner as "cooperative," "well-mannered," and "polite." *Id*. The Petitioner's mother refused to believe that the Petitioner could commit any criminal offenses, and lead counsel was unaware of an incident in which the Petitioner allegedly had kidnapped and raped his girlfriend's mother. *Id*.

Dr. Frank Einstein, a self-employed sentencing consultant and mitigation expert, testified about his normal procedure in completing a mitigation investigation and said that compiling an accurate social history for a defendant would take one to two or three years. *Id*. at *10. The Petitioner's mitigation consultant did almost all of the work in the Petitioner's case just two weeks before he pled guilty. *Id*. In Dr. Einstein's opinion, the mitigation consultant did not spend enough time investigating the Petitioner's case, which resulted in the Petitioner's trial team's failing to discover mitigation evidence about the Petitioner and his extended family. *Id*. That information consisted of the Petitioner's behavior in his high school years; radical changes in his behavior two years before the murder, including kidnapping and raping his girlfriend's mother; and mental illness in at least nine of his extended family members. *Id*. Dr. Einstein thought a psychiatrist should have examined the Petitioner for sentencing. *Id*. He acknowledged that the Petitioner's trial team had evidence of physical trauma experienced by the Petitioner. *Id*. at *11.

Dr. Zager testified at the post-conviction evidentiary hearing that trial counsel retained her to evaluate the Petitioner and that she spent three hours with him for the evaluation in November 1997. *Id*. at *15. In January 1998, Dr. Zager reviewed the Petitioner's medical records from Le Bonheur Children's Hospital. *Id*. The records

showed that the Petitioner had been hit by a car while riding his bicycle when he was twelve years old and that he was rendered unconscious. *Id*. Nevertheless, Dr. Zager gave her opinion to trial counsel that the Petitioner was competent to stand trial and that the evidence was insufficient to support an insanity defense. *Id*. After the Petitioner's guilty pleas, Dr. Zager administered the MMPI and determined that the Petitioner suffered from a personality disorder with narcissistic and antisocial traits.[1] *Id*. at *15-16. However, that diagnosis did not constitute a major mental illness and was not very valuable in asserting a defense. *Id*. at *16. After initiation of the post-conviction proceedings, Dr. Zager received additional information that she was not aware of at the time of her initial diagnosis. *Id*. The additional information included details about more crimes committed by the Petitioner, which Dr. Zager could have used to refine her diagnosis. *Id*. She said that Bipolar Type 2 was a mood disorder, not a psychosis, and that a Bipolar Type 2 diagnosis for the Petitioner was not inconsistent with the MMPI she administered to him. *Id*.

Dr. Pamela Auble, a clinical psychologist, testified that she was involved in the Petitioner's post-conviction case. *Id*. at *17. She explained that the MMPI was a personality test and that the MMPI was not a sufficient tool for providing a "full picture" of a person's psychology. *Id*. at *16. Dr. Auble interviewed the Petitioner, administered a litany of tests, and reviewed records about his history, including the medical records from Le Bonheur. *Id*. Dr. Auble concluded that the Petitioner did not have "'global or general deficits'" but that he did have "'some specific problems in his mental abilities.'" *Id*. She conceded that the personality style identified by Dr. Zager was similar to the personality style she observed in her own evaluation of the Petitioner, and she agreed with Dr. Zager's diagnosis of narcissistic traits and antisocial personality. *Id*. at *18. Dr. Auble was unable to diagnosis the Petitioner with an Axis I major mental disorder. *Id*.

Dr. William Kenner, a psychiatrist hired by post-conviction counsel, testified that he reviewed "quite a stack of material" in this case, including interviews with the Petitioner's family members. *Id*. Dr. Kenner noted that the Petitioner was a successful athlete in high school and "showed great promise." *Id*. at *19. However, his behavior changed in early adulthood. *Id*. He began committing serious crimes, including abducting and raping the mother of his girlfriend on two separate occasions and abducting the younger sister of an ex-girlfriend. *Id*. The Petitioner also had a family history "heavily loaded for bipolar disorder" and was experiencing a period of difficulty sleeping at the time of Deputy Bishop's murder. *Id*. Dr. Kenner concluded that the Petitioner was suffering from Bipolar Type 2 disorder at the time of the killing and that he "was suffering from a major medical illness that affected his abilities to control his behavior in this case." *Id*. at *18, *20.

---

[1] "MMPI" is the acronym for the Minnesota Multi-Phasic Personality Inventory. *See State v. Flake*, 114 S.W.3d 487, 498 (Tenn. 2003).

Additional witnesses testified at the post-conviction evidentiary hearing about the Petitioner's behavior during and after high school, and family members testified about his family's mental health issues. *Id.* at \*11-14. Furthermore, post-conviction counsel tried to show a history of mental illness on both sides of the Petitioner's family by introducing mental health records for some of the Petitioner's maternal cousins, aunts, and uncles and his paternal grandmother. *Henderson v. Mays*, No. 12-5028, 2023 WL 3347496, at \*7 (6th Cir. May 10, 2023).

Relevant to this evidence, the post-conviction court, which also presided over the Petitioner's guilty plea and sentencing hearings, stated in its order denying post-conviction relief:

> "[T]he Court finds that Petitioner was not denied effective assistance of counsel. Counsel filed all the appropriate motions. Counsel was provided with expert services. Counsel allowed the investigative and mitigation expert to conduct their investigation and report to counsel their findings. It is true that trial counsel was not aware of all the history of mental illness in the Petitioner's family. Also true was that counsel was not completely aware of some of the violent events that the Petitioner engaged in shortly before this incident. It is true that counsel was aware from the expert clinical psychologist that Petitioner was diagnosed with a personality disorder, not otherwise specified, with narcissistic traits. However, their expert did not see any bipolar tendency, and counsel, under the circumstances, acted in a competent manner in presenting this psychological proof to the Court. It is true that counsel's mitigation expert did not make as an extensive mitigation investigation as Post-conviction mitigation expert opined was necessary. However, two points need to be addressed. One, there was a mitigation investigation and a review of the trial transcript revealed that various witnesses testified on Petitioner's behalf in an effort to produce mitigation. Secondly, the Court places little weight on the testimony of Petitioner's mitigation expert, especially when he opined that it would take two to three years to do a proper mitigation investigation. Lastly, as trial counsel stated, this was a case where finding mitigation was difficult, and as explained hereinafter, also a double-edged sword. Therefore, the Court concludes that counsel was not ineffective.
>
> . . . .
>
> The Court can now look to the additional mitigation proof offered at this hearing in assessing whether the result would have been different. . . . The Petitioner was a normal student in grammar and high school. He was a

- 7 -

talented basketball player and had a talent for art. About two years prior to this event, his behavior changed. He became violent. He viciously assaulted one girlfriend. He was convicted of some lesser felonies. Thereafter, he abducted the mother of his girlfriend on several occasions while masked. He also raped the mother. Petitioner's clinical psychologist opined that he had a personality disorder, but did not . . . disagree with trial counsel's clinical psychologist, other than she administered more tests. Finally, Dr. Kenner diagnosed the Petitioner as bipolar. . . . Dr. Kenner opined that in order to fully explain the nature of Petitioner's bipolar diagnosis, the trier of fact would have to hear all the details of Petitioner's various assaults, abductions and rapes.

    . . . .

[T]he statutory aggravating circumstances . . . by the State were simply overwhelming. The Court considered the mitigating testimony, especially the testimony regarding this personality disorder. This proffered new mitigating testimony regarding Dr. Kenner's bipolar diagnosis, only reinforces the Court's opinion that the aggravating circumstances outweighed, in fact overwhelmed, any mitigating evidence. . . . The Court is assuming . . . that Dr. Kenner's diagnosis is correct. Had this testimony been offered at the trial, the State, of course, would have had the opportunity to rebut same. . . . Secondly, the evidence presented regarding the [Petitioner's] abduction of his girlfriend's mother, the rapes, the assaults, lead the Court to the conclusion that the Petitioner's acts were calculated, cold and deliberate. These are the same calculated and deliberate actions that led to the death of Tommy Bishop. Whether or not they were the result of a bipolar condition would not have changed the Court's decision to impose a sentence of death."

*Henderson*, 2005 WL 1541855, at *21.

In affirming the post-conviction court's denial of relief, this court stated:

It appears that the crux of the [P]etitioner's complaint is the failure to introduce evidence regarding the alleged existence of a bipolar type 2 mental illness. The existence of such a mental illness would have been apparent, suggests the [P]etitioner, had trial counsel discovered a family history of mental illness and evidence of the [P]etitioner's erratic criminal behavior. Dr. Zager failed to diagnosis the [P]etitioner with anything more severe than a personality disorder. The [P]etitioner blames this diagnosis on trial counsel's failure to gather sufficient information. The [P]etitioner ignores the fact that Dr. Zager's diagnosis remained the same even after reviewing

- 8 -

the additional information. Moreover, the [P]etitioner's own post-conviction witness, Dr. Auble, arrived at essentially the same diagnosis as Dr. Zager. While Dr. Kenner eventually diagnosed the [P]etitioner as Bipolar Type 2, his diagnosis would have necessitated the introduction of evidence regarding the [P]etitioner's escalating history of violent crime, which is a tactic with considerable risk. The [P]etitioner's claim, at best, amounts to an assertion that counsel should have obtained an expert who would have diagnosed the petitioner as Bipolar Type 2. The Constitution does not require attorneys to "shop around" for more favorable expert testimony. *Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992). Additionally, the necessary introduction of the [P]etitioner's violent criminal behavior could have undermined this mitigating factor and outweighed any beneficial mitigating impact of the mental illness evidence. This "undiscovered" mitigation evidence raised by the [P]etitioner was correctly characterized by the post-conviction court as being a "double-edged sword."

Given the strength of the proof of the aggravating circumstances relied upon by the State, the mitigation evidence that was presented at sentencing[,] and the possible negative impact of the "undiscovered" mitigation evidence, we conclude that had this information been presented to the court there is little reason to believe the trial judge would impose a sentence other than death. The [P]etitioner is not entitled to relief on this basis. Indeed, in this case, unlike the situation where a jury imposes a death sentence, we are not left to speculate to some degree as to the effect this evidence might have had on the sentencer. The sentencer in this case, the trial judge himself, found this evidence would not have altered the result of the sentencing hearing.

*Id*. at *42-43.

The record reflects that on January 24, 2006, the Petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Tennessee, raising numerous claims for relief. *Henderson*, 2023 WL 3347496, at *10. In summary, the Petitioner asserted that he was incompetent to enter a guilty plea and waive jury sentencing, that trial counsel were ineffective for advising him to plead guilty and waive jury sentencing, and that trial counsel were ineffective for failing to discover and present evidence at sentencing that he suffered from brain damage. *Id*. In support of his arguments, the Petitioner later filed a response brief and attached a 2008 report prepared by Dr. Ruben C. Gur, a professor of neuropsychology at the University of Pennsylvania, who reviewed scans of the Petitioner's brain that were performed in 2002. *Id*. Dr. Gur determined that the Petitioner had an abnormal brain morphology and suffered from brain damage that

probably resulted from his bicycle accident as a child. *Id*. The United States Court of Appeals for the Sixth Circuit later summarized Dr. Gur's findings as follows:

> Dr. Gur concluded that [the Petitioner's "cranial volume is more than 2 standard deviations . . . below normal, a condition that occurs in less tha[n] 2.5% of the population," and that [the Petitioner] had "abnormally low brain volume" overall, a "sign of neurodevelopmental abnormalities." Dr. Gur noted that [the Petitioner's] cranial volume reduction was more significant in the left-top area of his head—the same spot where, as a child, he complained of soreness after his bicycle accident—and noted that the scans showed reductions consistent with "atrophy . . . often seen following head injury." Based on a clinical interview and computerized testing—conducted in conjunction with a review of the brain scans—Dr. Gur concluded "to a reasonable degree of scientific certainty" that [the Petitioner] "suffers from brain dysfunction" and "abnormalities in brain function in regions relevant to behavior, especially related to executive functions (frontal), attention and comprehension of complex information (parietal), and the integration of self (right parietal)." He concluded that these abnormalities were "most likely related to anoxia or traumatic brain injury," and indicate that [the Petitioner] "suffers from brain dysfunction that impairs his ability to modulate his behavior in accordance with context and may specifically lead to dissociative states, such as the state he was in when he committed the offenses."

*Id*.

The Petitioner also attached a 2008 report prepared by Dr. George Woods, a psychiatrist who performed a neuropsychiatric evaluation on the thirty-four-year-old Petitioner in 2007. Dr. Woods reviewed various information, including the transcripts of the sentencing and post-conviction evidentiary hearings, the medical records from the bicycle accident, the Petitioner's school and criminal records, and investigative interviews that were conducted with the Petitioner's family members in 2002. Dr. Woods diagnosed the Petitioner with genetically-derived Bipolar Type 1, rapid-cycling disorder. Dr. Woods concluded that, based on the structural damage to the Petitioner's brain found by Dr. Gur and the "genetically-derived mood disorder" diagnosed by Dr. Woods, the Petitioner was unable to conform his behavior to the law and was unable to make a knowing, voluntary, and intelligent waiver of his rights to a jury trial and to be sentenced by a jury. *Id*.

The district court denied the habeas corpus petition in October 2011. *Id*. The Petitioner appealed, and the Sixth Circuit remanded the case in July 2012 for reconsideration in light of *Martinez v. Ryan*, 566 U.S. 1 (2012). *Id*. at *12. On remand, the district court again denied the petition, and the Petitioner again appealed to the Sixth

Circuit. *Id.* On May 23, 2022, while the federal appeal was pending, the United States Supreme Court released its opinion in *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022), which held that that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."

On September 9, 2022, while the federal habeas corpus case was still pending in the Sixth Circuit and more than twenty-four years after the Petitioner's guilty pleas and sentence of death, counsel for the Petitioner filed the petition for a writ of error coram nobis that is the subject of this appeal. In the petition, the Petitioner alleged that newly discovered evidence of his mental health at the time of the crimes was developed during his federal habeas corpus case and that the evidence may have changed the outcome of his state case. Specifically, the new evidence consisted of the 2002 brain scans that showed a congenital brain anomaly and brain damage resulting from the bicycle accident. In support of this alleged new evidence, the Petitioner described and attached Dr. Gur's report, in which Dr. Gur explained the Petitioner's congenital brain morphology and brain damage, and Dr. Woods' report, in which Dr. Woods diagnosed the Petitioner with genetically-transmitted Bipolar Type 1, rapid-cycling disorder, a more disabling condition than either Bipolar Type 1 or Bipolar Type 2. The Petitioner asserted that he was without fault for not discovering and presenting the evidence earlier because trial counsel were ineffective for failing to investigate and present the mitigation evidence and that due process and equitable principles required tolling the statute of limitations. Subsequently, the Petitioner filed an amended petition for a writ of error coram nobis, claiming that post-conviction counsel had a conflict of interest that resulted in counsel's inability to locate the newly discovered evidence earlier and that due process required tolling the statute of limitations, particularly in light of *Shinn v. Ramirez*.

On March 8, 2023, the coram nobis court entered an order summarily denying the petition. First, the coram nobis court, noting that the Petitioner pled guilty in 1998, concluded that the petition was "clearly" untimely. The court then concluded that the Petitioner was not entitled to tolling the statute of limitations because he failed to explain why the evidence, which was available at the time of post-conviction, was not presented earlier. Finally, the coram nobis court concluded that even if the Petitioner had timely filed the coram nobis petition, the Petitioner's challenge to the effective assistance of trial and post-conviction counsel was not an appropriate ground for coram nobis relief. The Petitioner appealed the coram nobis court's summary denial of the petition to this court.

On May 10, 2023, the Sixth Circuit issued its opinion in the Petitioner's federal habeas corpus case. The Sixth Circuit concluded that the Petitioner already had argued in state court that trial counsel was ineffective for failing to conduct an adequate mitigation investigation that would have revealed "red-flag behavior," a family history of mental

- 11 -

illness, and a bipolar diagnosis and that he was not entitled to relief because the issue was adjudicated by the post-conviction court on the merits. *Henderson, 2023 WL 3347496* at *16-18. The Sixth Circuit examined the Petitioner's claim that trial counsel was ineffective for failing to discover his brain damage. However, that claim was never presented to a state court and was based entirely on the reports by Dr. Gur and Dr. Woods. *See id*. at *18. Ultimately, the Sixth Circuit determined that it was prevented by *Shinn v. Ramirez* from considering any evidence of the Petitioner's brain damage that was developed outside the state-court record. *Id*. Accordingly, the Sixth Circuit concluded that it was "bound" to deny habeas corpus relief. *Id*. at *19.

## ANALYSIS

The Petitioner contends that the coram nobis court erred by summarily denying his petition for a writ of error coram nobis because he presented newly discovered evidence in the form of brain scans that show he has brain damage and expert reports that show he has a severe mental illness, i.e., Bipolar Type 1, rapid-cycling bipolar disorder. He maintains that he was without fault in failing to present the evidence at sentencing and on post-conviction because trial and post-conviction counsel were ineffective and that he is entitled to equitable tolling of the statute of limitations in light of *Shinn v. Ramirez* because that ruling left him without a remedy in federal court. The State argues that the trial court properly denied the untimely petition because the delay in filing the petition was unreasonable as a matter of law, because ineffective assistance of counsel is not grounds for relief in a coram nobis petition, because the Petitioner is not raising a claim of actual innocence, and because a guilty plea may not be collaterally attacked with a coram nobis petition. For the reasons stated below, we conclude the coram nobis court properly denied the petition without a hearing.

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. *State v. Mixon,* 983 S.W.2d 661, 666 (Tenn. 1999). The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105, which provides in pertinent part:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

- 12 -

Tenn. Code Ann. § 40-26-105(b). Generally, a decision whether to grant a petition for a writ of error coram nobis rests within the sound discretion of the trial court. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

"In order to qualify as newly discovered evidence, 'the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible.'" *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018) (quoting *Payne v. State*, 493, S.W. 3d 478, 484-85 (Tenn. 2016)). To be considered "without fault," the petitioner must show that "the exercise of reasonable diligence would not have led to a timely discovery of the new information." *State v Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). "[C]oram nobis petitions with inadequate allegations are susceptible to summary dismissal on the face of the petition, without discovery or an evidentiary hearing." *Nunley*, 552 S.W.3d at 831.

A petition for a writ of error coram nobis must be filed within one year after the judgment becomes final. Tenn. Code Ann. § 27-7-103. For the purposes of coram nobis relief, a judgment becomes final thirty days after the entry of the judgment in the trial court if no post-trial motion is filed, or upon entry of an order disposing of a timely filed post-trial motion. *Mixon*, 983 S.W.2d at 670. The one-year statute of limitations may, however, be tolled on due process grounds. *Nunley*, 552 S.W.3d at 828-29 (citation omitted).

> If a petition for a writ of error *coram nobis* fails to show on its face either that it has been timely filed in accordance with Tennessee Code section 27-7-103 or specific facts showing why the petitioner is entitled to equitable tolling of the statute of limitations, the trial court is within its discretion to summarily dismiss it.

*Id*. at 829. Although the decision to grant or deny coram nobis relief rests within the sound discretion of the trial court, *see Vasques*, 221 S.W.3d at 527-28, "[w]hether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." *Nunley*, 552 S.W.3d at 830 (citation omitted).

As explained in *Workman v. State*, in determining whether to toll the statute of limitations, a court must weigh the petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. 41 S.W.3d 100, 103 (Tenn. 2001). For example, newly discovered evidence that may establish actual innocence in a capital case "far outweighs any governmental interest in preventing the litigation [of] stale claims." *Id*. Courts should use the following three-step process to balance these interests:

- 13 -

(1)   determine when the limitations period would normally have begun to run;

(2)  determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and

(3)  if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010) (quoting *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995) (both overruled on other grounds)).

First, we will address the State's claim that the Petitioner's guilty plea precludes him from seeking coram nobis relief.  In *Frazier v. State*, 495 S.W.3d 246, 253 (Tenn. 2016), our supreme court held that "the coram nobis statute is not available as a procedural mechanism for collaterally attacking a guilty plea" because a guilty plea is not a "trial." However, after the *Frazier* ruling, a panel of this court concluded that coram nobis relief is available to a petitioner seeking a new sentencing hearing in a capital case based on newly discovered evidence.  As this court explained,

In *Frazier*, our supreme court "emphasiz[ed] that the coram nobis statute makes repeated references to words such as 'evidence,' 'litigated,' and 'trial.'"  495 S.W.3d at [248].  So too does the section of our Code that governs sentencing in a capital case.  Tenn. Code Ann. § 39-13-204 ("jury," "opening statement," "closing argument," "evidence," "instructions," "deliberations," "verdict," "reasonable doubt," "new trial.").  . . .  As the supreme court emphasized, "The plain and ordinary meaning of the term 'litigated on [or at] the trial' in the context of criminal prosecutions refers to a contested proceeding involving the submission of evidence to a fact-finder who then must assess and weigh the proof in light of the applicable law and arrive at a verdict of guilt or acquittal."  495 S.W.3d at 250.  The sentencing phase of a capital trial is just such a contested proceeding.  Tenn. Code Ann. § 39-13-204; *see* [*State v. Harris*, 919 S.W.2d 323, 328 (Tenn. 1996)] (commenting on "acquittal" of death penalty based on jury's decision to impose life sentence…).

Finally, the remedy for a successful coram nobis petition is a new trial.  Tenn. Code Ann. § 40-26-105(c) ("and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause").  That is the same remedy the statute

governing sentencing in a capital case provides. Tenn. Code Ann. § 39-13-204(k) ("if the court finds error alone in the trial determining punishment, a new trial on the issue of punishment alone shall be held").

*Davidson v. State*, No. E2019-00541-CCA-R3-PD, 2021 WL 3672797, at *62 (Tenn. Crim. App. Aug. 19, 2021), *perm. app. denied* (Tenn. Dec. 8, 2021), *cert. denied* S. Ct. 2720 (2022). Although the petitioner in *Davidson* did not plead guilty, applying this court's reasoning in *Davidson*, a petitioner who pleads guilty in a capital case may attack a contested sentence based on a claim of newly discovered evidence. Therefore, we turn to the three-step analysis for weighing the Petitioner's interest in obtaining a hearing to present later-arising grounds for relief against the State's interest in preventing stale and groundless claims.

The Petitioner was sentenced on July 13, 1998. Accordingly, the statute of limitations began to run thirty days later on August 12, 1998, and expired one year later on August 13, 1999. The Petitioner did not file his petition for a writ of error coram nobis until September 9, 2022, more than twenty-three years after the statute of limitations expired.

Next, we must determine whether the ground for relief arose after the statute of limitations normally would have commenced. Part of the Petitioner's ground for relief is based on the brain trauma that resulted from the bicycle accident that occurred when he was twelve years old. Obviously, the Petitioner and his mother were aware of the bicycle accident when the Petitioner pled guilty. Additionally, the Petitioner's medical records from Le Bonheur were in trial counsel's possession and were provided to Dr. Zager in preparation for her testimony at sentencing. Dr. Zager testified at the post-conviction evidentiary hearing that she reviewed the records for sentencing and that she was aware of the accident. However, Dr. Zager concluded that the Petitioner suffered from a personality disorder with narcissistic and antisocial traits, and trial counsel relied on her diagnosis alone at sentencing. The long-term ramifications of the bicycle accident on the Petitioner's brain and his congenital brain anomaly were not revealed until the brain scans were performed in 2002 and Dr. Gur released his report in 2008. Likewise, the Petitioner's genetically-derived rapid-cycling disorder was not discovered until Dr. Woods evaluated the Petitioner and released his report in 2008. We note that the State does not argue that the Petitioner's ground for relief is not "later arising." Therefore, we move on to the third step in the analysis, whether the Petitioner was given a reasonable opportunity to present his claims.

At oral arguments, counsel for the Petitioner claimed that the newly discovered evidence was not available until 2011, when it was developed by federal habeas corpus counsel. However, that claim is generous to the Petitioner because the brain scans were

performed in 2002 and Dr. Gur and Dr. Woods completed their reports in 2008. Thus, the evidence was available and Petitioner could have asserted a coram nobis claim in 2008, at the latest. Instead, he filed his petition for a writ of error coram nobis in 2022, a delay of approximately fourteen years. Even assuming arguendo that both trial and post-conviction counsel were ineffective in failing to discover the evidence earlier, their ineffectiveness does not explain the Petitioner's fourteen-year delay in filing his petition.

The Petitioner asserts that he is entitled to equitable tolling in light of the Supreme Court's ruling in *Shinn v. Ramirez* because that case "changed the legal landscape" by prohibiting federal courts from considering evidence offered for the first time in a habeas corpus proceeding, thereby denying him a remedy in federal court. The Petitioner points out that he filed his coram nobis petition only three months after the *Shinn* opinion was released. Again, we reject this argument. Nothing prevented the Petitioner from filing a petition for a writ of error coram nobis while his federal habeas corpus case was pending. *See Irick v. State*, No. E2010-02385-CCA-R3-PD, 2011 WL 1991671, at *18 (Tenn. Crim. App. May 23, 2011) (stating, "That the petitioner was litigating related claims in either federal or state court did not preclude him from asserting these claims in a coram nobis petition as early as 1999 when the affidavits were first obtained."). In *Irick*, another capital case in which the petitioner alleged newly discovered evidence about his mental health, this court concluded that the eleven-year delay in filing the coram nobis petition was unreasonable and that, as a matter of law, he was not entitled to due process tolling. *Id.* As this court has stated, "A petitioner may not delay presenting a claim seeking coram nobis relief until "'every other avenue of relief ha[s] been exhausted.'" *Dellinger v. State*, No. E2013-02094-CCA-R3-ECN, 2015 WL 4931576, at *13 (Tenn. Crim. App. Aug. 18, 2015) (quoting *Irick*, 2011 WL 1991671, at *18). The delay in this case was even more excessive than the delay in *Irick*. Therefore, we conclude that the Petitioner is not entitled to due process tolling.

Finally, the State also claims that the Petitioner is not entitled to relief because he does not raise a claim of actual innocence. *See Nunley*, 552 S.W.3d at 828-29 (stating, "To accommodate due process concerns, the one-year statute of limitations may be tolled if a petition for a writ of error coram nobis seeks relief based upon new evidence of actual innocence discovered after expiration of the limitations period."). We note, as does the State in its brief, that the issue of whether a coram nobis petition must raise a claim of actual innocence for tolling the statute of limitations is currently pending before our supreme court. *Clardy v. State*, No. M2021-00566-SC-R11-ECN (Tenn. heard on oral arguments June 1, 2023). However, regardless of our supreme court's ruling in that case, the Petitioner is not entitled to an evidentiary hearing on his petition because the delay in filing the petition is unreasonable as a matter of law.

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the coram nobis court.

_____
JOHN W. CAMPBELL, SR., JUDGE